FILED
TAMPA, FLORIDA

2003 DEC 18 AM 9: 06

CLERK, U.S. BANKRUPTCY
COURT, MIDDLE
DISTRICT OF FLORIDA

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

GRUBBS CONSTRUCTION
COMPANY, INC.,

Case No. 03-08573-8W1

JOHN GARY GRUBBS,

Case NO. 03-08573-8W1
JOINTLY ADMINISTERED

Debtors.

_____/

US BANCORP EQUIPMENT FINANCE, INC.,

Plaintiff,

Adv. Case No.: _____

vs.

GRUBBS CONSTRUCTION COMPANY, INC.,
SOUTHTRUST BANK, NATIONAL ASSOCIATION,
ASTEC FINANCIAL SERVICES, INC.,
ASTEC INDUSTRIES, INC., and
HERNANDO COUNTY TAX COLLECTOR,

Defendants.

_____/

325526

## COMPLAINT TO DETERMINE VALIDITY, PRIORITY, AND EXTENT OF LIENS OR OTHER INTERESTS IN PROPERTY (ASPHALT PLANT) AND FOR INDEMNIFICATION

Plaintiff, US BANCORP EQUIPMENT FINANCE, INC., f/k/a U.S. BANCORP LEASING & FINANCIAL ("BANCORP"), by its undersigned counsel, hereby sues defendants, GRUBBS CONSTRUCTION COMPANY, INC. (the "Debtor"), SOUTHTRUST BANK, NATIONAL ASSOCIATION ("Southtrust"), ASTEC FINANCIAL SERVICES, INC., ASTEC INDUSTRIES INC., and HERNANDO COUNTY TAX COLLECTOR ("Tax Collector"), and alleges:

## COUNT  1

1.      This is an action to determine the validity, priority, and extent of liens or other interests in certain property pursuant to Bankruptcy Rule 7001(2).

2.      This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(K).  This court has jurisdiction pursuant to 28 U.S.C. §1334.

3.      Venue of this action is appropriate in this court pursuant to 28 U.S.C. §1409.

4.      On April 28, 2003, the Debtor filed a voluntary chapter 11 petition with this Court.

5.      On or about December 31, 2000, the Debtor entered into a Master Lease Agreement with Astec Financial Services, Inc, wherein the Debtor leased a portable 8' double-barrel asphalt plant (the "Asphalt Plant").  A copy of the Master Lease Agreement with related schedules and addenda is attached hereto as Composite Exhibit "A".

6.      On December 29, 2000, Astec Financial Services Inc., filed a UCC-1 Financing Statement with the Secretary of State of the State of Florida.  A copy of such financing statement is attached hereto as Exhibit "B".

7.      Subsequent to the Master Lease Agreement, Astec Financial Services, Inc., assigned all of its right, title, and interest in the Master Lease Agreement and the Asphalt Plant to BANCORP.  Such assignment was made pursuant to a Financing Program Agreement entered into between BANCORP and Astec Financial Services, Inc., on or about September 29, 1999, and on or about that date, Astec Industries, Inc. executed that certain guarantee (the "Guarantee"), guaranteeing all obligations, warranties

and representations under said assignment and the Financing Program Agreement. A copy of the Financing Program Agreement, which includes exhibits thereto containing the assignment (B-1) and the Guarantee (B-8), is attached hereto as Exhibit "C". (Astec Financial Services, Inc., and Astec Industries, Inc., shall hereinafter be referred to collectively as "ASTEC").

8.    BANCORP asserts an interest in the Asphalt Plant as the lessor under a true lease. On information and belief, ASTEC asserts an interest in the Asphalt Plant by virtue of the Master Lease Agreement, the Financing Program Agreement, and the Guarantee.

9.    Southtrust Bank asserts an interest in the Asphalt Plant by virtue of unrelated security agreements and UCC-1 Financing Statements. Southtrust filed UCC-1 Financial Statements with the Secretary of State of the State of Florida on November 9, 1999 and April 12, 2000. The latter financing statement is limited to property located in Citrus County, Florida, and cannot apply to the Asphalt Plant located in Hernando County, Florida.

10.    Southtrust also asserts an interest in the Asphalt Plant by virtue of a mortgage recorded in the Public Records of Hernando County, Florida, on or about April 23, 2003. Such mortgage was recorded within ninety (90) days of the Debtor's bankruptcy filing and is avoidable as a preference. Such mortgage may also be avoidable as a fraudulent transfer.

11.    The Debtor asserts that the subject lease is a disguised security agreement and that BANCORP is merely a secured creditor.

12. The Debtor also asserts that the Asphalt Plant is a "fixture" and that BANCORP's security interest is unperfected because ASTEC did not make a fixture filing with respect to the Asphalt Plant.

13. Even if the Asphalt Plant is a fixture, the interest of the Debtor as a hypothetical lien creditor is inferior to any security interest in favor of BANCORP. See Florida Statute §679.334(4).

14. The Tax Collector asserts an interest in the Asphalt Plant by virtue of certain *ad valorem* personal property taxes. The Tax Collector's interest is limited to those specific personal property taxes which relate to the value of the Asphalt Plant.

15. Even if the lease constitutes a disguised security agreement, the interest of Southtrust is inferior to the interest of BANCORP because such interest was properly perfected as a purchase money security interest.

16. Southtrust asserts that the purchase money security interest was not timely perfected because some of the parts or components of the Asphalt Plant were delivered more than fifteen (15) days prior to the filing of ASTEC's UCC-1 Financing Statement.

17. The purchase money security interest was timely perfected because the UCC-1 Financingl Statement was filed within fifteen (15) days of the completion of delivery, installation and inspection of the Asphalt Plant.

WHEREFORE, BANCORP demands judgment in its favor determining (a) that the subject transaction constitutes a "true lease" and that BANCORP's interest as a lessor is superior to the competing interests of the Debtor, SouthTrust and ASTEC; (b) in the event that such lease constitutes a disguised security agreement, that the security interest in favor of BANCORP is superior to the interest of the Debtor, SouthTrust and ASTEC;

(c) in the event that the Asphalt Plant constitutes a fixture, that the security interest in favor of BANCORP is superior to the interest of the Debtor, Southtrust and ASTEC; (d) that the interest of the Tax Collector is limited to those particular *ad valorem* personal property taxes which relate to the value of the Asphalt Plant; (e) that the SouthTrust mortgage is preferential or fraudulent and avoidable; and (f) for such other relief as the Court deems appropriate.

## COUNT 2

18.    BANCORP realleges and incorporates by reference paragraphs 1-17 herein. This is an action to for indemnification against ASTEC.  ASTEC has submitted to the jurisdiction of this Court by intervening in a related contested matter and actively participating in the bankruptcy case.

19.    Pursuant to the Financing Program Agreement, *inter alia,* ASTEC warranted and represented that:

> At the time U.S. Bancorp Leasing & Financial acquires a Contract, Vendor will have title to all Equipment that is subject to a True Lease and a perfected first propriety security interest in all Equipment that is the subject to an LIAS or a PMSI,, in each case free and clear of any lien, claim, encumbrance or security interest and such title or perfected first priority security interest shall pass to U.S. Bancorp Leasing & Financial
> ...

20.    ASTEC also agreed to indemnify BANCORP for any losses arising from or pertaining to, *inter alia,*  any breach of any covenant or representation  or warranty made by ASTEC to BANCORP; any interference by Debtor or mortgagee with BANCORP's right to repossess any equipment; and any alleged negligent or intentional act, omission, representation or misrepresentation of ASTEC, including but not limited to those in connection with the sale or financing of the Equipment and agreements and conduct relating thereto.

21.    As a result of the allegations made by the Debtor, SouthTrust Bank and Hernando County, and any other additional allegations that were made or will be made, BANCORP may incur losses or damages associated therewith if such allegations are adjudged against BANCORP or BANCORP is otherwise damaged.

22.    BANCORP is obligated to pay its attorneys reasonable fee for legal representation herein, and ASTEC agreed to pay such fees.

WHEREFORE, U.S. BANCORP EQUIPMENT FINANCE INC., demands judgment in its favor against ASTEC FINANCIAL SERCVICES, INC., and ASTEC INDUSTRIES, INC. for all damages and/or losses associated with or otherwise that are adjudged against BANCORP relative to the Asphalt Plant, the Master Lease Agreement, the assignment associated therewith, and/or the Financing Program Agreement, or any other matter referenced herein.

Dated this 12 day of Dec, 2003

Attorneys for U.S. Bancorp
Equipment Finance Inc.

Ronald M. Emanuel
Ronald M. Emanuel P.A.
3001 Ponce de Leon Blvd., Suite 262
Coral Gables, Fl. 33134
(305) 595-1133
(305) 444-9880 (fax)
FBN:0746932

Michael C. Markham
Johnson, Pope, Bokor,
Ruppel & Burns, P.A.
P.O. Box 1368
Clearwater, FL 33757
(727) 461-1818
(727) 443-6548 fax
FBN: 0768560

306945

# MASTER LEASE AGREEMENT

**THIS MASTER LEASE AGREEMENT,** dated as of ___December 31, 2000___ ("Agreement"), between Astec Financial Services, Inc., with an office at 1725 Shepherd Road, Chattanooga, TN 37421 (hereinafter called, together with its successors and assigns, if any, "**Lessor**"), and Grubbs Construction Company, a corporation organized and existing under the laws of the State of Florida with its chief place of business at 1115 S. Main Street, Brooksville, FL 34601 (hereinafter called "**Lessee**"):

## WITNESSETH:

## I. LEASING:

(a) Subject to the terms and conditions set forth below, Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment ("**Equipment**") described in Annex A to any schedule hereto ("**Schedule**"). Terms defined in a Schedule and not otherwise defined herein shall have the meanings ascribed to them in such Schedule.

(b) The obligation of Lessor to purchase Equipment from the manufacturer or supplier thereof ("**Supplier**") and to lease the same to Lessee under any Schedule shall be subject to receipt by Lessor, prior to the Lease Commencement Date (with respect to such Equipment), of each of the following documents in form and substance satisfactory to Lessor: (i) a Schedule relating to the Equipment then to be leased hereunder, (ii) a Purchase Order Assignment and Consent in the form of Annex B to the applicable Schedule, unless Lessor shall have delivered its purchase order for such Equipment, (iii) evidence of insurance which complies with the requirements of Section X, and (iv) such other documents as Lessor may reasonably request. As a further condition to such obligations of Lessor, Lessee shall, upon delivery of such Equipment (but not later than the Last Delivery Date specified in the applicable Schedule) execute and deliver to Lessor a Certificate of Acceptance (in the form of Annex C to the applicable Schedule) covering such Equipment, and, if requested by Lessee, deliver to Lessor a bill of sale therefor (in form and substance satisfactory to Lessor). Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier. Upon execution by Lessee of any Certificate of Acceptance, the Equipment described thereon shall be deemed to have been delivered to, and irrevocably accepted by, Lessee for lease hereunder.

## II. TERM, RENT AND PAYMENT:

(a) The rent payable hereunder and Lessee's right to use the Equipment shall commence on the date of execution by Lessee of the Certificate of Acceptance for such Equipment ("**Lease Commencement Date**"). The term of this Agreement shall be the period specified in the applicable Schedule. If any term is extended, the word "term" shall be deemed to refer to all extended terms, and all provisions of this Agreement shall apply during any extended terms, except as may be otherwise specifically provided in writing.

(b) Rent shall be paid to Lessor at its address stated above, except as otherwise directed by Lessor. Payments of rent shall be in the amount set forth in, and due in accordance with, the provisions of the applicable Schedule. If one or more Advance Rentals are payable, such Advance Rental shall be (i) set forth on the applicable Schedule, (ii) due upon acceptance by Lessor of such Schedule, and (iii) when received by Lessor, applied to the first rent payment and the balance, if any, to the final rental payment(s) under such Schedule. In no event shall any Advance Rental or any other rent payments be refunded to Lessee. If rent is not paid within ten days of its due date, Lessee agrees to pay a late charge of five cents (S.05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any.

## III. RENT ADJUSTMENT:

(a) The periodic rent payments in each Schedule have been calculated on the assumption (which, as between Lessor and Lessee, is mutual) that the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("**Effective Rate**") will be thirty-five percent (35%) each year during the lease term.

(b) If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, (the "**Code**")), the Effective Rate is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less .35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value, divided by (iii) the difference between the new Effective Tax Rate (expressed as a decimal) and one (1). The adjusted Termination Value shall be the Termination Value (calculated as of the first rental due in the year for which such adjustment is being made) less the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made) for all subsequent years of the lease term). Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made.

(c) Lessee's obligations under this Section III shall survive any expiration or termination of this Agreement.

## IV. TAXES:

Except as provided in Sections III and XV(c), Lessee shall have no liability for taxes imposed by the United States of America or any State or political subdivision thereof which are on or measured by the net income of Lessor. Lessee shall report (to the extent that it is legally permissible) and pay promptly all other taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or the purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rentals or receipts hereunder), any Schedule, Lessor or Lessee by any foreign, federal, state or local government or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (all hereinafter called "**Taxes**"). Lessee shall (i) reimburse Lessor upon receipt of written request for reimbursement for any Taxes charged to or assessed against Lessor, (ii) on request of Lessor, submit to Lessor written evidence of Lessee's payment of Taxes, (iii) on all reports or returns show the ownership of the Equipment by Lessor, and (iv) send a copy thereof to Lessor.

**EXHIBIT "A"**

ORIGINAL

## V.   REPORTS:

(a) Lessee will notify Lessor in writing, within ten (10) days after any tax or other lien shall attach to any Equipment, of the full particulars thereof and of the location of such Equipment on the date of such notification.

(b) Lessee will within ninety (90) days of the close of each fiscal year of Lessee, deliver to Lessor, Lessee's balance sheet and profit and loss statement, certified by a recognized firm of certified public accountants. Upon request Lessee will deliver to Lessor quarterly, within ninety (90) days of the close of each fiscal quarter of Lessee, in reasonable detail, copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee.

(c) Lessee will permit Lessor to inspect any Equipment during normal business hours.

(d) Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will promptly notify Lessor of any relocation of Equipment. Upon the written request of Lessor, Lessee will notify Lessor forthwith in writing of the location of any Equipment as of the date of such notification.

(e) Lessee will promptly and fully report to Lessor in writing if any Equipment is lost or damaged (where the estimated repair costs would exceed ten percent (10%) of its then fair market value), or is otherwise involved in an accident causing personal injury or property damage.

(f) Within sixty (60) days after any request by Lessor, Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default (as described in Section XII) or event which with notice or lapse of time (or both) would become such a default.

## VI.   DELIVERY, USE AND OPERATION:

(a) All Equipment shall be shipped directly from the Supplier to Lessee.

(b) Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its construction business and in a manner complying with all applicable federal, state, and local laws and regulations.

(c) LESSEE SHALL NOT ASSIGN, MORTGAGE, SUBLET OR HYPOTHECATE ANY EQUIPMENT, OR THE INTEREST OF LESSEE HEREUNDER, NOR SHALL LESSEE REMOVE ANY EQUIPMENT FROM THE CONTINENTAL UNITED STATES, WITHOUT THE PRIOR WRITTEN CONSENT OF THE LESSOR.

(d) Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

## VII.   SERVICE:

(a) Lessee will, at its sole expense, maintain each unit of Equipment in good operating order, repair, condition and appearance in accordance with manufacturer's recommendations, normal wear and tear excepted. Lessee shall, if at any time requested by Lessor, affix in a prominent position on each unit of Equipment plates, tags or other identifying labels showing ownership thereof by Lessor.

(b) Lessee will not, without the prior consent of Lessor, affix or install any accessory, equipment or device on any Equipment if such addition will impair the originally intended function or use of such Equipment. All additions, repairs, parts, supplies, accessories, equipment, and devices furnished, attached or affixed to any Equipment which are not readily removable shall be made only in compliance with applicable law, including Internal Revenue Service guidelines, and shall become the property of Lessor. Lessee will not, without the prior written consent of Lessor and subject to such conditions as Lessor may impose for its protection, affix or install any Equipment to or in any other personal or real property.

(c) Any alterations or modifications to the Equipment that may, at any time during the term of this Agreement, be required to comply with any applicable law, rule or regulation shall be made at the expense of Lessee.

## VIII.  STIPULATED LOSS VALUE: Lessee shall promptly and fully notify Lessor in writing if any unit of Equipment shall be or become worn out,

lost, stolen, destroyed, irreparably damaged in the reasonable determination of Lessee, or permanently rendered unfit for use from any cause whatsoever (such occurrences being hereinafter called "Casualty Occurrences"). On the rental payment date next succeeding a Casualty Occurrence (the "Payment Date"), Lessee shall pay Lessor the sum of (x) the Stipulated Loss Value of such unit calculated as of the rental next preceding such Casualty Occurrence ("Calculation Date"); and (y) all rental and other amounts which are due hereunder as of the Payment Date. Upon payment of all sums due hereunder, the term of this lease as to such unit shall terminate and (except in the case of the loss, theft or complete destruction of such unit) Lessor shall be entitled to recover possession of such unit.

## IX.   LOSS OR DAMAGE: Lessee hereby assumes and shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee.

## X.   INSURANCE: Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may require, including, but not limited to, insurance for damage to or loss of such Equipment and liability coverage for personal injuries, death or property damage, with Lessor named as additional insured and with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee. The insurance shall provide (i) liability coverage in an amount equal to at least ONE MILLION U.S. DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule, and (ii) casualty/property damage coverage in an amount equal to the higher of the Stipulated Loss value or the full replacement cost of the Equipment; or at such other amounts as may be required by Lessor. All such policies shall be with companies, and on terms, satisfactory to Lessor. Lessee agrees to deliver to Lessor evidence of

ORIGINAL

insurance satisfactory to Lessor. No insurance shall be subject to any co-insurance clause. Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with payments made as a result of such insurance policies. Any expense of Lessor in adjusting or collecting insurance shall be borne by Lessee. Lessee will not make adjustments with insurers except (i) with respect to claims for damage to any unit of Equipment where the repair costs do not exceed ten percent (10%) of such unit's fair market value, or (ii) with Lessor's written consent. Said policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor. Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor hereunder.

## XI.  RETURN OF EQUIPMENT:

(a)  Upon any expiration or termination of this Agreement or any Schedule, Lessee shall promptly, at its own cost and expense:  (i) perform any testing and repairs required to place the affected units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for their originally intended purpose; (ii) if deinstallation, disassembly or crating is required, cause such units to be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is satisfactory to Lessor; and (iii) return such units to a location within the continental United States as Lessor shall direct.

(b)  Until Lessee has fully complied with the requirements of Section XI(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate such continued leasehold interest upon ten (10) days notice to Lessee.

## XII.  DEFAULT:

(a)  Lessor may in writing declare this Agreement in default if: Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; Lessee breaches any of its insurance obligations under Section X; Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice thereof; any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; Lessee becomes insolvent or ceases to do business as a going concern; any Equipment is illegally used; or a petition is filed by or against Lessee or any Guarantor of Lessee's obligations to Lessor under any bankruptcy or insolvency laws. Such declaration shall apply to all Schedules except as specifically excepted by Lessor.

(b)  After default, at the request of Lessor, Lessee shall comply with the provisions of Section XI(a). Lessee hereby authorizes Lessor to enter, with or without legal process, any premises where any Equipment is believed to be and take possession thereof. Lessee shall, without further demand, forthwith pay to Lessor (i) as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rental next preceding the declaration of default), and (ii) all rentals and others sums then due hereunder. Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale; or Lessor may, but shall not be required to lease, otherwise dispose of or keep idle all or part of the Equipment; and Lessor may use Lessee's premises for any or all of the foregoing without liability for rent, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities:  (1) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (2) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee hereunder; then (3) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (4) any surplus shall be retained by Lessor. Lessee shall pay any deficiency in (1) and (2) forthwith.

(c)  The foregoing remedies are cumulative, and any or all thereof may be exercised in lieu of or in addition to each other or any remedies at law, in equity, or under statute. Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising. Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies hereunder, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default.

(d)  Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement.

## XIII.  ASSIGNMENT:  Lessor may, without the consent of Lessee, assign this Agreement or any Schedule. Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Equipment Schedule to such assignee or as instructed by Lessor. Lessee further agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee. Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever.

## XIV.  NET LEASE; NO SET-OFF, ETC:  This Agreement is a net lease. Lessee's obligation to pay rent and other amounts due hereunder shall be absolute and unconditional. Lessee shall not be entitled to any abatement or reductions of, or set-offs against, said rent or other amounts, including, without limitation, those arising or allegedly arising out of claims (present or future, alleged or actual, and including claims arising out of strict tort or negligence of Lessor) of Lessee against Lessor under this Agreement or otherwise. Nor shall this Agreement terminate or the obligations of Lessee be affected by reason of any defect in or damage to, or loss of possession, use or destruction of, any Equipment from whatsoever cause. It is the intention of the parties that rents and other amounts due hereunder shall continue to be payable in all events in the manner and at the times set forth herein unless the obligation to do so shall have been terminated pursuant to the express terms hereof.

## XV.  INDEMNIFICATION:

(a)  Lessee hereby agrees to indemnify, save and keep harmless Lessor, its agents, employees, successors and assigns from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature, in contract or tort, whether caused by the active or passive negligence of Lessor or otherwise, and including, but not limited to, Lessor's strict liability in tort, arising out of (i) the

0000573

selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee.  Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing.

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("Tax Benefits") in the hands of Lessor (all references to Lessor in this Section XV include Lessor and the consolidated taxpayer group of which Lessor is a member), and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or the terms of this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits.

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (x) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (y) any such Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (z) any such Tax Benefit is recomputed or recaptured (any such determination, disallowance, adjustment, recomputation or recapture being hereinafter called a "Loss"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, such amount as shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows, computed on the same assumptions, including tax rates (unless any adjustment has been made under Section III hereof, in which case the Effective Rate used in the next preceding adjustment shall be substituted), as were utilized by Lessor in originally evaluating the transaction (such yields and flows being hereinafter called the "Net Economic Return") to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred.  Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount.

(d) All of Lessor's rights, privileges and indemnities contained in  this section XV shall survive the expiration or other termination of this Agreement and the rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

## XVI.  DISCLAIMER: LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES.  LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED HEREUNDER OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE.  All such risks, as between Lessor and Lessee, are to be borne by Lessee. Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following, regardless of any negligence of Lessor (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) therein, or any other circumstance in connection therewith; (ii) the use, operation or performance of any Equipment or any risks relating thereto; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment.  If, and so long as, no default exists under this Lease, Lessee shall be, and hereby is, authorized during the term of this Lease to assert and enforce, at Lessee's sole cost and expense, from time to time, in the name of and for the account of Lessor and/or Lessee, as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Equipment.

## XVII.  REPRESENTATIONS AND WARRANTIES OF LESSEE: Lessee hereby represents and warrants to Lessor that on the date hereof and on the date of execution of each Schedule:

(a)  Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "Documents") and is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located.

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies therein provided may be limited under applicable bankruptcy and insolvency laws.

(c) No approval, consent or withholding of objections is required from any governmental authority or instrumentality with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained.

(d) The entry into and performance by Lessee of the Documents will not:  (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's Certificate of Incorporation or By-Laws; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e)  There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property.

0000573

(g)  Each Balance Sheet and Statement of Income delivered to Lessor has been prepared in accordance with generally accepted accounting principles, and since the date of the most recent such Balance Sheet and Statement of Income, there has been no material adverse change.

(h)  Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation (specified in the first sentence of this Agreement).

(i)  The Equipment will at all times be used for commercial or business purposes.

(j)  Year 2000 Compliance.  The computer software, computer hardware (whether general or specific purpose), imbedded micro controllers and non-computer equipment, and other similar and related items of automated, computerized, and/or software system(s) that are used or relied on by the Lessee, (collectively, "Information Technology") is designed to be used prior to, during, and after the calendar year 2000 A.D., and the Information Technology used during each such time period will accurately receive, provide and process date/time data (including, but not limited to, calculating, comparing and sequencing) from, into and between the twentieth and twenty-first centuries, including the years 1999 and 2000, and leap-year calculations and will not malfunction, cease to function, or provide invalid or incorrect results as a result of date/time data, to the extent that other Information Technology, used in combination with the Information Technology of the Lessee, properly exchanges date/time data with it.

## XVIII. EARLY TERMINATION:

(a)  On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("**Termination Date**") upon at least ninety (90) days prior written notice to Lessor.

(b)  Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS").  Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rental due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date.

(c)  Provided that all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value.  If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

(d)  Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment.  In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section XI) and (ii) pay to Lessor all amounts required under Section XVIII(b) less the amount of the highest bid certified by Lessee to Lessor.

## XIX.  PURCHASE OPTION:

(a)  So long as no default exists hereunder and the lease has not been earlier terminated, Lessee may at lease expiration, upon at least one hundred eighty (180) days prior written notice to Lessor, purchase all (but not less than all) of the Equipment in any Schedule on an AS IS WHERE IS BASIS, without recourse to or warranty from Lessor, express or implied, for cash equal to its then Fair Market Value (plus all applicable sales taxes).

(b)  "Fair Market Value" shall mean the price which a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell; provided, however, that in such determination: (i) the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement; (ii) in the case of any installed Equipment, that Equipment shall be valued on an installed basis; and (iii) costs of removal from current location shall not be a deduction from such valuation.  If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraised (reasonably acceptable to Lessee) to determine Fair Market Value, and that determination shall be final, binding and conclusive.  Lessee shall bear all costs associated with any such appraisal.

(c)  Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is determined (by agreement or appraisal).

## XX.  MISCELLANEOUS:

(a)  LESSEE HEREBY UNCONDITIONALLY WAIVES IT RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS LEASE, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT (INCLUDING, WITHOUT LIMITAITON, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS).  THIS WAIVER IS IRREVOCABLE MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS LEASE, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION.  IN THE EVENT OF LITIGATION, THIS LEASE MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

0000573

(b) Unless and until Lessee exercises its rights under Section XIX above, nothing herein contained shall give or convey to Lessee any right, title or interest in and to any Equipment except as a lessee. Any cancellation or termination by Lessor, pursuant to the provision of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder. All Equipment shall at all times remain personal property of Lessor regardless of the degree of its annexation to any real property and shall not by reason of any installation in, or affixation to, real or personal property become a part thereof.

(c) Time is of the essence of this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right thereafter to demand strict compliance therewith. Lessee agrees, upon Lessor's request, to execute any instrument necessary or expedient for filing, recording or perfecting the interest of Lessor. All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have designated in writing. This Agreement and any Schedule and Annexes thereto constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO.

(d) In case of a failure of Lessee to comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part; and all moneys spent and expenses and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor within five days after the date Lessor sends notice to Lessee requesting payment. Lessor's effecting such compliance shall not be a waiver of Lessee's default.

(e) Any rent or others amount not paid to Lessor when due hereunder shall bear interest, both before and after any judgment or termination hereof, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule which are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto.

**IN WITNESS WHEREOF,** Lessee and Lessor have caused this Master Lease Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

Astec Financial Services, Inc.

By: _Treena M. Hixon_

Name: _Treena M. Hixon_

Title: _Secretary_

LESSEE:

Grubbs Construction Company

By: _____

Name: _John G. Grubbs_

Title: _President_

0000573

## CONSTRUCTION EQUIPMENT SCHEDULE
### SCHEDULE NO. ____1____ DATED AS OF ____December 31, 2000____
### TO MASTER LEASE AGREEMENT
### DATED AS OF ____December 31, 2000____

Lessor & Mailing Address

Astec Financial Services, Inc.
1725 Shepherd Road
Chattanooga, TN 37421

Lessee & Mailing Address:

**Grubbs Construction Company**
**1115 S. Main Street**
**Brooksville, FL 34601**

Capitalized terms not defined herein shall have the meanings assigned to them in the Master Lease Agreement identified above ("Agreement"), terms of which are incorporated herein; said Agreement and this Schedule being collectively referred to as "Lease").

## A. Equipment

Pursuant to the terms of the Lease, Lessor agrees to acquire and lease to Lessee the Equipment listed on Annex A attached hereto and made a part hereof.

## B. Financial Terms

1. Advance Rent (if any): **N/A**
2. Security Deposit: **N/A**
3. Capitalized Lessor's Cost: **$2,707,040.00**
4. Rental Payment: **$37,808.43**
5. Basic Term Lease Rate Factor: **.013967**
6. Daily Lease Rate Factor: **.000466**
7. Basic Term ( No. of Months): **Eighty-four (84) Months**
8. Basic Term Commencement Date: **December 31, 2000**
9. Equipment Location: **Brooksville, FL and various job sites**
10. Lessee Federal Tax ID No.: **59-2340230**
11. Supplier: **Astec, Inc.**
12. Last Delivery Date: **December 15, 2000**
13. First Termination Date: **Seventy-two (72) months after the Basic Term Commencement Date.**

## C. Tax Benefits

Depreciation Deductions:

a. Depreciation Method: 200% declining balance method, switching to straight line method for the 1st taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year will yield a larger allowance.

b. Recovery Period: 5 Years

c. Basis: 100% of Capitalized Lessor's Cost.

## D. Term and Rent

1. Interim Rent. For the period from and including the Delivery Date to the Basic Term Commencement Date ("Interim Period"), Lessee shall pay as rent ("Interim Rent") for each unit of Equipment, the product of the Daily Lease Rate Factor times the Capitalized Lessor's Cost of such unit times the number of days in the Interim Period. Interim Rent shall be due on N/A.

2. Basic Term Rent. On the first day of each month beginning February 1, 2001 (each, a "Rent Payment Date") during the Basic Term, Lessee shall pay as rent ("Basic Term Rent") the product of the Basic Term Lease Rate Factor times the Capitalized Lessor's Cost of all Equipment on this Schedule.

3. Adjustment to Capitalized Lessor's Cost. Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessor's Cost up or down by no more than ten percent (10%) to account for equipment change orders, equipment returns, invoicing errors, and similar matters. Lessee acknowledges and agrees that the Rent shall be adjusted as a result of such change in the Capitalized Lessor's Cost (pursuant to paragraphs 1 and 2 above). Lessor shall send Lessee written notice stating the final Capitalized Lessor's Cost, if different from that disclosed on this Schedule.

0 0 0 0 5 7 3 0 0 1

## E. Insurance

1. Public Liability: $1,000,000 total liability per occurrence.

2. Casualty and Property Damage: An amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment.

## F. Modifications and Additions to Agreement

For the purposes of this Schedule only , the Agreement is amended as follows:

1. The first sentence of Section V(d) shall be deleted in its entirety and the following substituted in its stead:

   (d) Lessee will promptly notify Lessor in writing of a change in the Equipment Location in the event that any unit of Equipment fails to return to such location for a period of ninety (90) consecutive days.

2. Section V shall be amended by adding the following as subsection (g) thereof:

   (g) Lessee shall promptly notify Lessor of any malfunction of the hobbs or hour meter.

3. Section VI(b) shall be amended to add the following sentence at the end thereof:

   Lessee will allow only qualified, properly-licensed personnel selected, employed and controlled by Lessee to operate the Equipment.

4. RETURN CONDITIONS: In addition to the provisions provided for in Section XI of the Lease, and provided that Lessee has elected not to exercise its option to purchase the Equipment, Lessee shall, at its expense, return the Equipment as specified below:

   (a) General Condition: All Equipment must be in good working order with at least 50% life remaining wear on all component parts (i.e. trunnions, flights, chain, mixer tips, shanks, bags, etc.). Frame and structural members including attachments will be structurally sound, without breaks, bends, or cracks. All units returned will be cleaned and cosmetically acceptable, with all rust and corrosion properly removed and/or treated. All material (i.e. aggregate, asphalt, oil, fuel, dust/lime, refuse, etc.) must be properly removed from the equipment and disposed of in accordance with all federal, state, and local laws and regulations.

   (b) Portable Equipment: All tires shall be of the same original size, type and manufacturer (or similar quality manufacturer if the original manufacturer no longer produces tires of that type) as upon delivery to Lessee. On each unit, the tires shall have no missing or damaged parts or gouges. Also, all tires shall have a minimum of fifty percent (50%) remaining wear.

   (c) Mechanical Drive Train: If so equipped, the drive systems including but not limited to motors, gear boxes, final drives, will be in good condition and operate quietly without vibrations or leaks.

   (d) Hydraulic Equipment: All hydraulic pumps, cylinders and hoses must be fully operational at rated capacity with no leaks.

   (e) Documents and Records: Each such unit shall meet and conform to all applicable federal, state, and local health and safety laws and requirements, and, if applicable, have appropriate ANSI inspection certificates, permits and other certification necessary to operate the Equipment. Without limiting the foregoing, Lessee shall maintain and provide to Lessor written records of preventative maintenance and repairs, indicating date, and (hobbs) hourmeter readings to show when such maintenance or repair work was performed.

   (f) Redelivery: Provide for transportation of the Equipment in a manner consistent with the manufacturer's recommendations and practices to any locations within the continental United States as Lessor shall direct; and shall have the Equipment unloaded at such locations.

   (g) Storage: Provide safe, secure storage for the Equipment for a period of up to (90) ninety days after expiration or early termination of Lease at a location(s) deemed satisfactory to Lessor.

   INSPECTIONS:

   (a) At Lessor's expense, at least twenty-one (21) days prior to, and not more than sixty (60) days prior to lease expiration, each item of Equipment must be inspected by a manufacturers authorized maintenance representative or other qualified maintenance provider (acceptable to Lessor) to ensure the Equipment conforms to the return provisions outlined herein.
   (b) From ninety (90) days prior to the return of the Equipment, Lessee must make the Equipment available to Lessors agent during regular working hours so walk-around appraisals/inspections can be conducted.
   (c) The results of the testing and appraisal, with necessary reconditioning, documenting that the Equipment meets the return conditions required are to be provided to Lessor thirty (30) days prior to the return of the Equipment.

Except as expressly modified hereby, all terms and provisions of the Agreement shall remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee, respectively.

0000573001

ORIGINAL

**IN WITNESS WHEREOF**, Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:
**Astec Financial Services, Inc.**

By: _Treena M Hixon_

Name: _Treena M. Hixon_

Title: _Secretary_

LESSEE:
**Grubbs Construction Company**

By: _____

Name: _John G. Grubbs_

Title: _President_

WITNESS:

By: _____

3 of 3

**0000573001**

**ORIGINAL**

## ANNEX A
## TO
## SCHEDULE NO. ___1___ DATED AS OF ____December 31, 2000____
## TO MASTER LEASE AGREEMENT
## DATED AS OF ____December 31, 2000____

### DESCRIPTION OF EQUIPMENT

| Manufacturer | Serial Numbers | Type and Model of Equipment | Number of Units | Cost Per Unit |
|---|---|---|---|---|
| Astec | 00-721 | Portable 8' Double Barrel Asphalt Plant | One (1) | $2,707,040.00 |

See Schedule A for list of components

together with all present and future attachments, accessories, replacements, parts, repairs, additions, and all proceeds thereof

Initials: _____        _____
          Lessor                        Lessee

**0000573001**

SCHEDULE A

# PORTABLE 8' DOUBLE BARREL® PLANT
*as per the following specifications:*

| QTY | CODE | MODEL | DESCRIPTION |
|---|---|---|---|
| 1 | | PCF-1014-4A | Portable 10' x 14' Four Compartment Cold Feed System |
| 4 | | SF.02 | 24" belt feeders with idlers |
| 1 | | OF.01 | Telescoping legs with plate foundations |
| 1 | | OF.02 | Built in retaining wall |
| 1 | | OF.03 | Bin vibrator |
| 1 | | PCF-1014-4B | Portable 10' x 14' Four Compartment Cold Feed System |
| 4 | | SF.02 | 24" belt feeders with idlers |
| 1 | | OF.01 | Telescoping legs with plate foundations |
| 1 | | OF.02 | Built in retaining wall |
| 1 | | OF.03 | Bin vibrator |
| 2 | | OF.05 | Bolt -on three sided bin dividers for **both** PCF-1014-4 cold feed systems. |
| 1 | | PSS-512-60 | Portable 30" x 60' Inclined Conveyor/5' x 12' SS |
| 1 | | OF.02 | Remote drum bypass |
| 1 | | OF.04 | Transfer conveyor mounted over screen |

Note: Hydraulic erection is excluded

0000573001

| | | |
|---|---|---|
| 1 | PDB-330S | Portable 8' x 35' DOUBLE BARREL® Drum Mixer |
| 1 | SF.02 | 120 MBTU StarJet SJ-580 No. 2 oil burner |
| 1 | SF.03 | Type-J thermocouple for mix temperature |
| 1 | OF.01 | Steel plate foundations |
| 1 | OF.06 | Heavy oil conversion kit |

Notes: Hydraulic erection is excluded
Double Barrel to have lime inlet
Double Barrel to have fiber pipe - 4" diameter x 1' in recycle chute with mate camlock

| | | |
|---|---|---|
| 1 | PBH-58:DB/SP | Portable 68,895 CFM Pulse Jet Baghouse |
| 1 | SF.02 | Dust screw to DOUBLE BARREL® |
| 1 | SF.03 | BCB-542 exhaust fan |
| 1 | OF.01 | Built-in plate foundations |
| 2 | OF.02 | Additional modules of bags/cages |
| 1 | SP.08 | Increase fan motors to 150 HP and air compressor to 60 HP |
| 1 | SP.20 | DACC-802 15 TPH Dust Blower System |
| 1 | SP.21 | DACC-802 5" Dust piping (max. 40' length) |
| 1 | SP.22 | Special waste pipe (refer to 96-183 & 96-122) |

Note: Hydraulic erection is excluded

| | | |
|---|---|---|
| 1 | NG-3-90DB | 900 Ton New Generation Storage System including: |
| 3 | NG-30 | 300 Ton Storage Silos |
| 1 | SF.01 | 1/4" 360 Brinell liners on outside silos |
| 1 | SF.02 | Hot oil heat on cone and drag |

0000573001

| | | |
|---|---|---|
| 1 | SF.04 | Seismic IIA design |
| 1 | DC-36100-1 | 36" single chain drag conveyor |
| 1 | SF.03 | Stairway on one side of drag |
| 1 | SF.05 | Internal flop gates at traverse conveyor |
| 1 | OF.02 | Full 1/2" ceramic cone liners on center silo |
| 1 | OF.09 | Bottom drag dropout chute |
| 2 | TC-3614 | 36" traverse conveyors |
| 1 | | SIHI 90 gpm hot oil pump |
| 1 | | Hot oil piping |

| | | |
|---|---|---|
| 1 | LPS-8010 | 10' x 80' Low Profile Truck Scale |

| | | |
|---|---|---|
| 1 | CCH-1 | Command I Control Center |
| 1 | SF.01 | 5 ton central heating/air-conditioning unit |
| 1 | OF.05 | Prewiring and premounting of consoles |
| | | Note: Control house will sit on a customer supplied 8' block base |

| | | |
|---|---|---|
| 1 | PM-96-WM-2 | Process Mate 96A-1 with WM-2000 Load-out Controls |
| 4 | OF.01 | Additional cold feed controls with manual backups |
| | | Note: Anti-strip control is to be used for fiber |

| | | |
|---|---|---|
| 1 | TES-50 | Total Electrical System/Portable Drum Mix Plant including: |
| | | Cables |
| | | Plugs & receptacles |

0000573001

| 1 | | PRB-814-50 | Portable Recycle Feed System |
| 1 | | OF.01 | 4" x 12" bar grizzly |
| 1 | | OF.02 | Built-in retaining wall |
| 1 | | SP.06 | Side & front plates for grizzly |
| 1 | | SP.17 | 4' x 8' dual deck screen w/ transfer conveyor i.l.o. 3' x 6' single deck screen |
| | | | **Note:** Hydraulic erection is excluded |

| 1 | | DACC-822 | 12" Diameter x 24'-0" Long Dust Screw |
| 1 | | SP.02 | Clean out plugs on 4' centers |
| | | | Note: See Item #4 on next page |

| 1 | Heatec | DCT-20 | 20,000 Gallon Dual Containment Fuel Tank |
| 1 | Heatec | SP.01 | Double wall bulkhead (no insulation)<br>Note: Tank to be split 10/10, fuel connection each end. must meet UL-142 code. |

| 1 | HEATEC | MACC-2025 | 3" Twin pump AC metering system, 10 HP |

| 1 | HEATEC | HT-30P | 30,000 Gallon Heli-Tank |
| 1 | | SF.01 | No. 2 oil burner |
| 1 | | SF.02 | 6" insulation |
| 1 | | SF.03 | Prepainted aluminum ivory skin |
| 1 | | SF.04 | Tandem axle portability |
| 1 | | OF.05 | HT-P-5 350 gallon capacity No. 2 fuel tank on gooseneck |
| 1 | | OF.09 | HT-30P-9 Steel plate foundations (5 plates) |
| 1 | | SP.02 | HC-120 Heater i.l.o. HCS-100 |

0000573001

| | | | |
|---|---|---|---|
| 2 | HEATEC | ACAP-0014 | 90 GPM Hot Oil Pumps (SIHI) |
| 2 | | OF.01 | Starters for pumps |

| | | | |
|---|---|---|---|
| 1 | HEATEC | TAV-20E | 20,000 Gallon Vertical Asphalt Tank With Coils |
| 1 | | SF.02 | 6" insulation |
| 1 | | OF.02 | TAV-E-2 Prepainted ivory enamel skin |
| 1 | | OF.03 | TAV-20E-3 OSHA approved caged ladder |
| 1 | | OF.04 | TAV-E-4 Handrails around tank top |
| 1 | | OF.06 | TAV-E-6 Mixer/agitator for polymer |
| 1 | | SP.06 | Level sensor with digital readout |

| | | | |
|---|---|---|---|
| 1 | HEATEC | ACAP-005 | 3" Asphalt Unloading Pump |
| 1 | | OF.01 | Starter for pump |

| | | | |
|---|---|---|---|
| 1 | HEATEC | HACC-1437 | 3" Piping from Tank to Asphalt Metering Package |

| | | | |
|---|---|---|---|
| 1 | HEATEC | HACC-1440 | 3" Piping from Metering Package Outlet to Drum |

| | | | |
|---|---|---|---|
| 1 | HEATEC | HACC-1442 | 4" Piping Metering Package to 2nd Tank |

| | | | |
|---|---|---|---|
| 1 | HEATEC | HACC-1449 | 3" Piping of AC. Unloading Pump to 2nd Tank |

0000573001

**ANNEX C**
**TO**
**SCHEDULE NO. ____1____ DATED AS OF __December 31, 2000__**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF ____December 31, 2000__**

## CERTIFICATE OF ACCEPTANCE

To: Astec Financial Services, Inc. ("Lessor")

Pursuant to the provisions of the above schedule and lease (collectively, the "Lease"), Lessee hereby certifies and warrants that (a) all Equipment listed below has been delivered or is accepted by Lessee in accordance with the purchase contract between Astec, Inc. and Lessee; (b) Lessee has inspected the Equipment, and all such testing as it deems necessary has been performed by Lessee, Supplier or the manufacturer; (c) Lessee accepts the Equipment for all purposes of the Lease, the purchase documents and all attendant documents; and (d) the Equipment was first delivered to Lessee within ten (10) days of the date hereof.

Lessee does further certify that as of the date hereof (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by lessee pursuant to or under the Lease are true and correct on the date hereof and (iii) Lessee has reviewed and approves of the purchase documents for the Equipment, if any.

## DESCRIPTION OF EQUIPMENT

| Manufacturer | Serial Numbers | Type and Model of Equipment | Number of Units | Cost Per Unit |
|---|---|---|---|---|
| Astec | 00-127 | Portable 8' Double Barrel Asphalt Plant | One (1) | $2,707,040.00 |

See Schedule A for list of components

together with all present and future attachments, accessories, replacements, parts, repairs, additions, and all proceeds thereof

Grubbs Construction Company

By: _____

Title: __Presioent__

---

| NOTICE OF INSURANCE |
|---|
| |
| AGENT                                    PHONE NUMBER |

**0000573001**

**ANNEX D**
**TO**
**SCHEDULE NO. ____1____ DATED AS OF ____December 31, 2000____**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF ____December 31, 2000____**

## STIPULATED LOSS TABLE*

| Date | Percent of Cost |
|------|-----------------|
| 2/1/01 | 104.48 |
| 1/1/02 | 98.54 |
| 1/1/03 | 89.87 |
| 1/1/04 | 78.54 |
| 1/1/05 | 65.52 |
| 1/1/06 | 51.74 |
| 1/1/07 | 37.20 |
| 1/1/08 | 21.82 |

Initials: _____        _____
       Lessor                                    Lessee

* The Stipulated Loss for any unit of Equipment shall be equal to the Capitalized Lessor's Cost of such unit multiplied by the appropriate percentage derived from the above table. In the event that the Lease is for any reason extended, then the last percentage figure shown above shall control throughout any such extended term.

0000573001

# ADDENDUM
## TO SCHEDULE NO. _____1_____ DATED AS OF __December 31, 2000__
## TO MASTER LEASE AGREEMENT
## DATED AS OF _____December 31, 2000_

THIS ADDENDUM (this "Addendum") amends and supplements the above referenced schedule (the "Schedule") to the above referenced lease (the "Lease"), between Astec Financial Services, Inc. ("Lessor") and Grubbs Construction Company ("Lessee") and is hereby incorporated into the Schedule as though fully set forth therein. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Lease.

For purposes of this Schedule only, the Lease is amended by adding the following thereto:

## EARLY PURCHASE OPTION:

(a) Provided that the Lease has not been earlier terminated and provided further that Lessee is not in default under the Lease or any other agreement between Lessor and Lessee, Lessee may, UPON AT LEAST 30 DAYS BUT NO MORE THAN 270 DAYS PRIOR WRITTEN NOTICE TO LESSOR OF LESSEE'S IRREVOCABLE ELECTION TO EXERCISE SUCH OPTION, purchase all (but not less than all) of the Equipment listed and described in this Schedule on the rent payment date (the "Early Purchase Date") which is Seventy-two (72) months from the Basic Term Commencement Date of the Schedule for a price equal to Nine Hundred Thirty-three Thousand Nine Hundred Twenty-eight Dollars and Eighty Cents ($933,928.80) (the "FMV Early Option Price"), plus all applicable sales taxes on an AS IS BASIS. The FMV Early Option Price is in addition to the Basic Term Rent payment due on the Early Purchase Date. Lessor and Lessee agree that the FMV Early Option Price is a reasonable prediction of the Fair Market Value (as such term is defined in Section XIX(b) hereof) of the Equipment at the time the option is exercisable. Lessor and Lessee agree that if Lessee makes any non-severable improvement to the Equipment which increases the value of the Equipment and is not required or permitted by Sections VII or X of the Lease prior to lease expiration, then at the time of such option being exercised, Lessor and Lessee shall adjust the purchase price to reflect any addition to the price anticipated to result from such improvement. (The purchase option granted by this subsection shall be referred to herein as the "Early Purchase Option".)

(b) If Lessee exercises its Early Purchase Option with respect to the Equipment lease hereunder, then on the Early Purchase Option Date, Lessee shall pay to Lessor any Rent and other sums due and unpaid on the Early Purchase Option Date and Lessee shall pay the FMV Early Option Price, plus all applicable sales taxes, to Lessor in cash.

Except as expressly modified hereby, all terms and provisions of the Lease shall remain in full force and effect. This Addendum is not binding nor effective with respect to the Lease or the Equipment until executed on behalf of Lessor and Lessee by authorized representatives of Lessor and Lessee.

IN WITNESS WHEREOF, Lessee and Lessor have caused this Addendum to be executed by their duly authorized representatives as of the date first above written.

LESSOR:                                          LESSEE:

Astec Financial Services, Inc.                   Grubbs Construction Company

By: _Treena M. Hixon_____             By: _____

Name: _Treena M. Hixon_____            Name: _John G. Grubbs_____

Title: _Secretary_____             Title: _President_____

0000573001

ORIGINAL

## CERTIFICATE CONCERNING
## PAYMENT OF PERSONAL PROPERTY TAXES
### (LESSEE REPORTS EQUIPMENT)

To:     Astec Financial Services, Inc.

To insure Lessee's compliance with the provisions of the Master Lease Agreement dated as of __December 31, 2000__ (the "**Lease**") by and between the undersigned, as Lessee, and **Astec Financial Services, Inc.**, as Lessor, with respect to the payment of personal property taxes on the Equipment described in Annex A to Schedule No. __1__ to the Lease, Lessee hereby agrees that it will (a) list all such Equipment, (b) report all property taxes assessed against such Equipment and (c) pay all such taxes when due directly to the appropriate taxing authority until Lessor shall otherwise direct in writing. Upon request of Lessor, Lessee shall promptly provide proof of filing and proof of payment to Lessor.

LESSEE:   **Grubbs Construction Company**

By: _____

Title: _Presioent_ _____

0000573001



**MENDMENT AGREEMENT**

Equipment Finance
PC Box 2177, 7659 S.W. Mohawk Street
Tualatin, OR 97062

Schedule Number 20001484A-012-1484-001

AMENDMENT to Schedule No. 1 dated as of December 31, 2000 to Master Lease Agreement dated as of December 31, 2000 (the "Agreement(s)") between Grubbs Construction Company as Lessee and U.S. Bancorp Equipment Finance, Inc., as assignee from Astec Financial Services, Inc. as Lessor. In consideration of the mutual premises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, intending to be legally bound, hereby agree and acknowledge as follows:

1.   Upon payment of an Extension Fee in the amount of $1,000.00, Lessee shall owe monthly payments under the Agreement(s) as follows: One (1) rental payment in the amount of $48,777.33, followed by five (5) rental payments in the amount of $10,968.90 each, followed by sixty-seven (67) rental payments in the amount of $37,808.43 each, followed by one (1) rental payment in the amount of $0.00.  The Early Purchase Option has been amended to seventy-eight (78) months from the Basic Term Commencement Date at the price of $969,460.27.  The first such payment shall be due on June 01, 2002 and shall continue on the same day of each month thereafter until the end of the term of this Schedule.  Additional charges, including property tax, sales tax, late fees, insurance fees, collection fees and legal fees, shall be billed as they arise.

2.   The Term of the Agreement(s) shall continue and extend until July 31, 2008; such continuation and extension shall be effective for all intents and purposes (including, without limitation, for purposes of exercising any Purchase Option/Title Passage provision in regard to any leased Property).

3.   This Amendment shall constitute an amendment to and shall override the provisions of the Agreement(s); all provisions of the Agreement(s) other than those which are inconsistent with the provisions of this Amendment are hereby ratified and confirmed. This Agreement(s) constitutes the entire agreement of the parties hereto in regard to the subject matter hereof. There are no representations, warranties, or covenants made by Lessee or Lessor in connection with this Amendment except as expressly set forth herein. Capitalized terms used but not defined herein are used with the respective meanings set forth in the Agreement(s).

4.   Lessee hereby waives any and all notices to which it may be entitled as a condition to the effectiveness of this instrument. This Amendment shall take effect as a sealed instrument and shall be binding upon, and inure to the benefit of the parties hereto and the beneficiaries hereof and their respective successors and assigns.

IN WITNESS WHEREOF, the undersigned has executed this Amendment as of this ___ day of _____, 20 ___

U.S. Bancorp Equipment Finance, Inc., as assignee from    Grubbs Construction Company
Astec Financial Services, Inc.

By: _____                              By: _____
An Authorized Officer thereof                             John C. Grubbs
                                                         President

APPROVED:  ORIGINAL GUARANTOR HEREBY ACKNOWLEDGE THAT THEIR GUARANTIES REMAIN IN FULL EFFECT.

_____
John C. Grubbs

9/01

STATE OF FLORIDA

UNIFORM COMMERCIAL CODE    FINANCING STATEMENT    FORM UCC-1 (REV. 1993)

This Financing Statement is presented to a filing officer for filing pursuant to the Uniform Commercial Code:

| 1. Debtor (Last Name First if an Individual) Grubbs Construction Company | | 1a. Date of Birth or FEI# 59-2340230 | |
|---|---|---|---|
| 1b. Mailing Address 1115 S. Main Street | 1c. City, State Brooksville    FL | | 1d. Zip Code 34601 |
| 2. Additional Debtor or Trade Name (Last Name First if an Individual) | | 2a. Date of Birth or FEI# | |
| 2b. Mailing Address | 2c. City, State | | 2d. Zip Code |
| 3. Secured Party (Last Name First if an Individual) Astec Financial Services, Inc. | | | 62-1638264 |
| 3a. Mailing Address 1725 Shepherd Road | 3c. City, State Chattanooga    TN | | 3d. Zip Code 37421 |
| 4. Assignee of Secured Party (Last Name First if an Individual) | | | |
| 4a. Mailing Address | 4c. City, State | | 4d. Zip Code |

5. This Financing Statement covers the following types of items or property [Include description of real property on which located and owner of record when required. If more space is required, attach additional sheets(s)].

One (1) Astec Portable 8' Double Barrel Asphalt Plant

together with all present and future attachments, accessories, replacements, parts, repairs, additions, and all proceeds thereof

True Lease - For Notification Purposes Only

| 6. Check only if Applicable: | [X] Products of collateral are also covered. | [X] Proceeds of collateral are also covered. | [ ] Debtor is transmitting utility. |
|---|---|---|---|

7. Check appropriate box: (One box must be marked)  [X] All documentary stamp taxes due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.  [ ] Florida Documentary Stamp Tax is not required.

8. In accordance with s. 679.472(2), F.S., this statement is filed without the Debtor's signature to perfect a security interest in collateral:

[ ] already subject to a security interest in another jurisdiction when it was brought into this state or debtor's location changed to this state.
[ ] which is proceeds of the original collateral described above in which a security interest was perfected.
[ ] as to which the filing has lapsed. Date filed _____ and previous UCC-1 file number _____
[ ] acquired after a change of name, identity, or corporate structure of the debtor.

9. Number of additional sheets presented: ___0___

This Space for Use of Filing Officer

2000002919 50--2
-12/29/00--01061-019
****25.00

10. Signature(s) of Debtor(s)

Grubbs Construction Company

11. Signature(s) of Secured Party or if Assigned, by Assignee(s)

Astec Financial Services, Inc.

*[signature]*

12. Return Copy to:

| Name | Astec Financial Services, Inc. |
|---|---|
| Address | Attn: Misty Walker |
| Address | 1725 Shepherd Road |
| City, State, Zip | Chattanooga, TN 37421 |

FILED

DEC 29, 2000 08:00 AM

SECRETARY OF STATE
TALLAHASSEE, FLORIDA

200000291950   WA

FILING OFFICER COPY        ST/        UCC-1        Approved by Secretary of State, State of Flori

EXHIBIT "B"

**FINANCING PROGRAM AGREEMENT** ("Agreement") dated as of September 29, 1999 is entered into between **U.S. Bancorp Leasing & Financial** an Oregon corporation, with its principal office at P.O. Box 2177, Tualatin, Oregon 97062-2177 and **ASTEC FINANCIAL SERVICES, INC.** ("Vendor"), a Tennessee corporation, with its principal office at 1725 Shepherd Road, Chattanooga, Tennessee 37421.

## RECITALS

A.    Vendor and its Affiliates are in the business of manufacturing, or selling or leasing Equipment (the term "Equipment" and other capitalized terms are defined in Exhibit A) to third party Users for commercial or business purposes. Vendor enters into Contracts with the Users, each of which is either an LIAS (Lease Intended as Security) within the meaning of the UCC, or a True Lease within the meaning of the UCC and the Internal Revenue Code, or a purchase money security interest (PMSI) within the meaning of the UCC.

B.    Vendor desires to finance certain Contracts and related Equipment by selling and assigning to U.S. Bancorp Leasing & Financial in one or more Portfolio purchase and sale transactions, payments due or to become due under such Contracts and selling and assigning to U.S. Bancorp Leasing & Financial (or granting U.S. Bancorp Leasing & Financial a security interest in) the Contracts and the Equipment covered thereby.

C.    Astec Industries, Inc., a Tennessee corporation ("Program Guarantor") is the direct owner of 100% of the outstanding common stock of Vendor and will benefit from the accommodations provided to Vendor hereunder and is willing to enter into the Program Guaranty in favor of U.S. Bancorp Leasing & Financial.

D.    U.S. Bancorp Leasing & Financial is willing to finance such Contracts and Equipment upon the terms and conditions contained herein.

## AGREEMENT

1.    Financing Requests; Approvals.

1.1    Financing Requests. When Vendor desires to finance Contracts in a Portfolio, Vendor shall submit to U.S. Bancorp Leasing & Financial a properly completed Financing Request. U.S. Bancorp Leasing & Financial will use its best efforts to review each Financing Request upon receipt and to notify Vendor in a timely manner if additional information is required. The decision to accept or reject a Financing Request shall be at the sole discretion of U.S. Bancorp Leasing & Financial.

1.2    Approval; Revocation in Full. Upon its acceptance of a Financing Request, U.S. Bancorp Leasing & Financial shall issue an Approval, setting forth any terms and conditions thereof, including but not limited to any required additional payments or security deposits, guarantees, or recourse. Unless a shorter period of time is specified in the Approval, each Approval expires 90 days from the date it is granted and may be

1

extended or renewed at the sole discretion of U.S. Bancorp Leasing & Financial. U.S. Bancorp Leasing & Financial may revoke an Approval with regard to the entire Portfolio if at any time before it finances the relevant Contracts U.S. Bancorp Leasing & Financial determines, in its sole discretion, one or more of the following has occurred:

      (a)    any representation made in that or any other Financing Request or any document submitted with that or any other Financing Request is or was false or misleading;

      (b)    a Material Adverse Change as to Program Guarantor or Vendor since the date of the most recent Financial Statements delivered by such persons;

      (c)    any Termination Event, or

      (d)    this Agreement is terminated under Section 10.2.

1.3    <u>Partial Revocation</u>. U.S. Bancorp Leasing & Financial may revoke an Approval as to any Contract if at any time before it finances such contract U.S. Bancorp Leasing & Financial determines, in its sole discretion:

      (a)    a Material Adverse Change has occurred as to the User since the date of financial information regarding User on which U.S. Bancorp Leasing & Financial was relying in rendering its Approval; or

      (b)    the Contract is not a Conforming Contract, or any other representation and warranty made by Vendor regarding such Contract or the User is deemed untrue in any material respect.

1.4    <u>Disapproval</u>. U.S. Bancorp Leasing & Financial may, but shall not be obligated, to give Vendor notice of rejection of a Financing Request. U.S. Bancorp Leasing & Financial shall not be deemed to have approved any Financing Request unless it issues an Approval thereof. Upon any rejection of a Financing Request, U.S. Bancorp Leasing & Financial shall return to Vendor all materials submitted to U.S. Bancorp Leasing & Financial by or on behalf of Vendor in connection with the Financing Request excluding any information developed by U.S. Bancorp Leasing & Financial.

2.    Financing of Contracts.

2.1    <u>Nature of Financings</u>. Each Disbursement Amount U.S. Bancorp Leasing & Financial pays to Vendor for a Portfolio shall be deemed payment in respect of a purchase by U.S. Bancorp Leasing & Financial of all accounts, general intangibles, instruments, chattel paper and all other rights of Vendor in respect of each Contract within such Portfolio including, if the relevant Contract is a True Lease, the residual interest (*i.e.*, the lessor's reversionary and remainder interest in the Equipment upon termination of the lease) in the relevant Equipment.

2

2.2    <u>Disbursement Amounts</u>. A valid Approval must be in effect on the Closing Date for each Portfolio. Upon receipt and approval of all documents described in <u>Exhibit B</u> required by U.S. Bancorp Leasing & Financial and compliance by Vendor and the Program Guarantor with any other conditions in any Program Document or in an Approval, U.S. Bancorp Leasing & Financial shall on the relevant Closing Date pay to Vendor the Disbursement Amount for each Contract in the Portfolio financed under this Agreement. The Disbursement Amount shall be the present value of all remaining Scheduled Payments due under each Contract and any residual amount specified in the Approval, discounted at the Discount Rate agreed to by the parties. For this purpose, the amounts payable by a User under a Contract may include the costs of freight, installation, in-transit insurance, prepaid maintenance and taxes if those costs are accurately reflected in the Financing Request and relevant invoices and fully paid out over the term of the Contract.

2.3    <u>Conditions to Closing</u>. In addition to any conditions contained in the relevant Approval or otherwise specified herein, each closing and funding with respect to any Portfolio that is the subject of an Approval on a Closing Date shall be subject to the following conditions:

    (a)    U.S. Bancorp Leasing & Financial has not revoked its Approval under Section 1.2 in respect of such Portfolio;

    (b)    All documentation requirements set forth in <u>Exhibit B</u> hereto are satisfied;

    (c)    U.S. Bancorp Leasing & Financial shall have completed a field audit of Vendor and the applicable Contracts, the results of which are satisfactory to U.S. Bancorp Leasing & Financial in its sole discretion; and

    (d)    The key indicators for the applicable Contracts taken as a whole for such Portfolio shall not have materially changed in the opinion of U.S. Bancorp Leasing & Financial since the date of the field audit and the Closing Date. "Key indicators" means, without limitation, delinquency experience, User creditworthiness, Contract enforceability, lien or title perfection, and non-performing status of Contracts with any applicable User.

3.    <u>Representations and Warranties</u>.

3.1    <u>Vendor Representations and Warranties</u>. Vendor represents and warrants to U.S. Bancorp Leasing & Financial with respect to the Contracts assigned to U.S. Bancorp Leasing & Financial under this Agreement as of each Closing Date as follows:

    (a)    At the time U.S. Bancorp Leasing & Financial acquires a Contract, Vendor will have title to all Equipment that is subject to a True Lease and a perfected first priority security interest in all Equipment that is subject to an LIAS or a PMSI, in each case free and clear of any lien, claim, encumbrance or security interest and such title or perfected first priority security interest shall pass to U.S. Bancorp Leasing &

Financial upon U.S. Bancorp Leasing & Financial's payment to Vendor of the Disbursement Amount.

(b) Each Contract and all related documents delivered to U.S. Bancorp Leasing & Financial: (i) are genuine, duly authorized, and properly executed with authentic signatures by all the parties thereto; (ii) are valid, binding, and enforceable against each party in accordance with their terms; (iii) comply with all applicable laws; (iv) do not allow any Payments due and to become due under a Contract to be subject to any defense, offset, deduction, counterclaim, or lien; (v) have not been pledged or assigned to any party other than U.S. Bancorp Leasing & Financial; (vi) have not had any event occur which with notice or passage of time or both would constitute a default or termination event on the part of either the Vendor or a User; (vii) contain true and accurate representations, warranties and statements of fact, including all amounts and unpaid balances; (viii) constitute the entire agreement between Vendor and a User for carrying out the transactions described in the Contract and have not been modified or amended or any indulgence or waiver granted, except as disclosed in writing to U.S. Bancorp Leasing & Financial; and (ix) are Conforming Contracts.

(c) Neither Vendor nor or agents, distributors, employees, or Affiliates have: (i) committed or participated in or will commit or participate in any fraudulent act or activity in connection with the performance by Vendor pursuant to a Contract or this Agreement; (ii) failed to provide to U.S. Bancorp Leasing & Financial or falsified or withheld any information that concerns a User and is materially relevant to evaluation of any Financing Request, advised the User to modify or withhold any such information, or otherwise acted in a fraudulent manner in connection with such information, or (iii) in soliciting, arranging or consummating the Contracts and U.S. Bancorp Leasing & Financial's financing of the Contracts, subjected U.S. Bancorp Leasing & Financial to suit or administrative proceeding under any federal or state law, rule or regulation.

(d) Neither Vendor nor any of its Affiliates has received, nor will any of them receive for its own account any prepayment of any Scheduled Payment or other Payment, rent, security deposit, escrow, maintenance, reserves or other money from the User, and if Vendor or Affiliate receives any such amounts it will do so as a trustee for U.S. Bancorp Leasing & Financial and will immediately remit the funds to U.S. Bancorp Leasing & Financial. Neither Vendor nor any of its Affiliates has made, nor will any of them make any solicitation, collection, adjustment, or allowance in respect of any Contract, or accept the return of or make any substitution of any financed Equipment, except pursuant to U.S. Bancorp Leasing & Financial's request.

(e) The relevant Equipment and related Software: (i) conform to applicable specifications and all warranties, whether express or implied; and do not infringe any actual or alleged patent, copyright or trade secret; (ii) are as described in the Contract, invoice and purchase order; (iii) have been sold to the relevant User or are being sold to U.S. Bancorp Leasing & Financial as the case may be, at Vendor's then prevailing prices giving full effect to all discounts offered to the general public or any significant sector thereof and such sales price has been paid in full; and (iv) all taxes which are due and

4

payable in connection with the acquisition of the Equipment and related Software as of the Closing Date of the sale of the Equipment by Vendor to U.S. Bancorp Leasing & Financial have been paid in full.

(f)     Vendor: (i) is and will at all times be in full compliance with the Equal Credit Opportunity Act, Fair Credit Reporting Act and all other laws applicable to the Contracts, including without limitation all applicable state usury and installment sale laws, and (ii) has and will have all government approvals, permits, certificates, inspections, consents and franchises necessary to conduct its business as it currently conducts it and to own or finance and operate its properties as now owned or financed by it.

(g)     There is only one original of each Contract which is deemed chattel paper under the UCC, which has been marked "original" and delivered to U.S. Bancorp Leasing & Financial, and only one original of each promissory note issued with respect to each Contract that is a PMSI, which has been marked "original" and delivered to U.S. Bancorp Leasing & Financial. All the other copies of the Contract are marked "copy".

(h)     There has occurred no Termination Event.

(i)     Vendor has developed and implemented a comprehensive, detailed program to address on a timely basis the "Year 2000 problem" (that is, the risk that computer applications used by Vendor may be unable to recognize and perform properly date-sensitive functions involving certain dates prior to and any date after December 31, 1999) and reasonably anticipates that it will on a timely basis successfully resolve the Year 2000 problem for all material computer applications used by it. Vendor, on the basis of inquiry made, believes that each supplier, vendor and customer of Vendor that is of material importance to the financial well-being of Vendor will also successfully resolve on a timely basis the Year 2000 problem for all of its material computer applications.

(j)     All taxes due and payable with respect to the Contract and the related Equipment as of the Closing Date of the assignment and sale of the Contract and Equipment by Vendor to U.S. Bancorp Leasing & Financial have been paid in full.

(k)     Each schedule to a master Contract constitutes a separate obligation of User enforceable by U.S. Bancorp Leasing & Financial without regard to other schedules executed pursuant to such master Contract.

(l)     Vendor is not aware of the existence of any facts which would materially impair the value or validity of the Contract, or any related documents, any rights created thereby, the Equipment or this Agreement.

Vendor's representations and warranties under this Section shall be continuing representations and warranties which survive any expiration or termination of this Agreement and the termination of any Contract.

Vendor acknowledges and agrees that each of the foregoing representations and warranties, and those in Section 3.3, are material and may be relied upon by U.S. Bancorp Leasing & Financial regardless of any investigation or audit U.S. Bancorp Leasing & Financial may conduct (which it is under no obligation to do).

3.2   Vendor's Acknowledgment: Purchase and Sale. Vendor acknowledges that U.S. Bancorp Leasing & Financial has not made, nor has Vendor relied upon, any representation or warranty as to the legal, accounting, or tax characterization or effect of this Agreement or any financing or other transaction contemplated hereby, and that Vendor has consulted its own advisers with respect to such matters. The parties intend that the conveyance of the Contracts and Vendor's interest in the Equipment subject thereto contemplated by this Agreement shall constitute a purchase and sale and not a loan. If, notwithstanding the foregoing, such purchase and sale is deemed by a court of competent jurisdiction to be a pledge of assets as security for a loan, then (a) Vendor shall be deemed to have granted to U.S. Bancorp Leasing & Financial, and for such purpose does hereby grant, a duly perfected first priority security interest in Collateral, and (b) this Agreement shall be deemed to constitute a security agreement under applicable law.

3.3   Vendor's and U.S. Bancorp Leasing & Financial's Mutual Warranties and Representations. U.S. Bancorp Leasing & Financial as to itself represents and warrants to Vendor, and Vendor as to itself represents and warrants to U.S. Bancorp Leasing & Financial as follows as of each Closing Date:

    (a)   It is a corporation, duly organized and validly existing, has full corporate power to enter into this Agreement and each of the other Program Documents and to carry out the transactions contemplated hereby and is validly existing or in good standing in the state of its incorporation.

    (a)   The execution and delivery of this Agreement and each of the other Program Documents and the performance by it of the transactions contemplated hereby and thereby (i) have been duly authorized by all necessary corporate action and this Agreement and each of the other Program Documents constitutes its legal, valid, and binding obligation, enforceable in accordance with its terms; (ii) will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Vendor pursuant to the terms of, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which it or any of its Affiliates is bound or to which any of its property or assets is subject; nor will such action result in any violation of the provisions of its Certificate or Articles of Incorporation or its By-Laws or any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties; and no consent, approval, authorization, order, registration or qualification of or with any court or any such regulatory authority or other governmental agency or body is required for the sale and assignment of the Equipment or Contracts or the grant of a security interest in the

Collateral hereunder or the consummation of the other transactions contemplated by this Agreement.

(c)    It is in compliance with all covenants and agreements contained in this Agreement.

4.    <u>Indemnification.</u>

4.1    <u>Indemnification of U.S. Bancorp Leasing & Financial</u>. Notwithstanding anything herein to the contrary, Vendor shall indemnify and hold U.S. Bancorp Leasing & Financial and its affiliates and subsidiaries, and their respective employees, officers, and agents harmless from and against any and all Losses arising from or pertaining to:

(a)    any breach of any covenant or representation or warranty made by Vendor to U.S. Bancorp Leasing & Financial in this Agreement or in any other Program Document;

(b)    the use, maintenance or operation of any Equipment financed under this Agreement;

(c)    any actual or alleged environmental liability or violation of laws protecting the environment or regulating hazardous wastes or substances and resulting from the use or operation of the Equipment;

(d)    any actual or alleged patent infringement, or copyright or trade secret violation relating to the Equipment or the use thereof (including any interest or penalty) whether or not such claim, action or proceeding involves a claim or infringement of a combination or design patent;

(e)    any interference by any User's lessor or mortgagee with U.S. Bancorp Leasing & Financial's right to repossess any Equipment;

(f)    the alleged negligent or intentional act, omission, representation or misrepresentation of Vendor or any of its Affiliates or distributors, or their respective employees, officers or agents, including but not limited to those in connection with the sale or financing of the Equipment and agreements and conduct relating thereto;

(g)    the alleged failure of Vendor to perform its obligations under any Program Document, under any invoice purchase order or under any other related document; or

(h)    the failure of any Contract or Equipment to comply with applicable laws, regulations or contractual specifications or warranties, as the case may be.

Nothing contained herein shall be construed to compel U.S. Bancorp Leasing & Financial to contest any Loss or to permit Vendor to participate in any such contest. However, U.S. Bancorp Leasing & Financial agrees, where practicable, to notify Vendor

with reasonable promptness of any claim that may become the subject of the indemnity of this Section 4.1, and to consult with Vendor prior to settling any claim asserted against it by a third party covered by this Section 4.1, provided that any final decision as to such settlement shall be U.S. Bancorp Leasing & Financial's alone, and any failure to provide such notice shall not exonerate Vendor from its indemnity obligation.

4.2    Insurance.    Vendor shall maintain public liability, property damage, and employer's liability insurance covering the risks indemnified against by Vendor in this Agreement, and any claims under any applicable worker's compensation laws or in relation to any occupational disease laws. Such insurance shall: (i) name Vendor as insured and U.S. Bancorp Leasing & Financial as additional insured, (ii) be in amounts and with insurers reasonably satisfactory to U.S. Bancorp Leasing & Financial, (iii) be cancelable only upon 30 days prior written notice to U.S. Bancorp Leasing & Financial, (iv) contain, if U.S. Bancorp Leasing & Financial so requests, breach of warranty and waiver of subrogation endorsements satisfactory to U.S. Bancorp Leasing & Financial, and (v) be primary and without contribution from any other insurance carried by U.S. Bancorp Leasing & Financial. Upon request, Vendor shall furnish U.S. Bancorp Leasing & Financial with insurance policies or certificates evidencing such insurance.

4.3    Indemnification of Vendor.    Notwithstanding anything herein to the contrary, U.S. Bancorp Leasing & Financial shall indemnify and hold Vendor and its affiliates, and their respective employees, officers, and agents harmless from and against any and all claims, liabilities, demands, expenses, interest, penalties and proceedings whatsoever involving or affecting vendor (including, without limitation, reasonable attorneys' fees and allocated time charges of internal counsel) (collectively, "Vendor Losses") arising from or pertaining to any breach of any covenant or representation or warranty made by U.S. Bancorp Leasing & Financial to Vendor in this Agreement or in any other Program Document including but not limited to U.S. Bancorp Leasing & Financial's obligations under Section 5.3 of this Agreement.

Nothing contained herein shall be construed to compel Vendor to contest any Vendor Loss or to permit U.S. Bancorp Leasing & Financial to participate in any such contest. However, Vendor agrees, where practicable, to notify U.S. Bancorp Leasing & Financial with reasonable promptness of any claim that may become the subject of the indemnity of this Section 4.3, and to consult with U.S. Bancorp Leasing & Financial prior to settling any claim asserted against it by a third party covered by this Section 4.3, provided that any final decision as to such settlement shall be Vendor's alone, and any failure to provide such notice shall not exonerate U.S. Bancorp Leasing & Financial from its indemnity obligation.

4.4    Survival of Indemnity.    All obligations under this Section 4 shall survive any expiration or termination of this Agreement and the termination of any Contract.

5.    General Covenants of Vendor and U.S. Bancorp Leasing & Financial

8

5.1   <u>Affirmative Covenants of Vendor.</u> From the date hereof, until this Agreement is terminated pursuant to Section 10.2, Vendor will, unless U.S. Bancorp Leasing & Financial shall otherwise consent in writing:

(a)   <u>Compliance with Laws, Etc.</u>   Comply with all applicable laws, rules, regulations and orders to which Vendor is subject.

(b)   <u>Preservation of Corporate Existence.</u>   Preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its organization, and qualify and remain validly existing or qualified in good standing as a corporation in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualification would materially adversely affect (i) the interests of U.S. Bancorp Leasing & Financial under this Agreement or (ii) the ability of Vendor to perform its obligations under this Agreement or any other Program Document.

(c)   <u>Audits.</u>   From time to time during regular business hours upon reasonable notice (unless a Termination Event has occurred, in which case at any time requested) permit U.S. Bancorp Leasing & Financial or its agents or representatives, on a joint basis, (i) to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer tapes and disks) in the possession or under the control of Vendor relating to Contracts, including, without limitation, any related purchase orders and other agreements, and (ii) to visit the office and properties of Vendor for the purpose of examining such materials described in clause (i) next above, and to discuss matters relating to Contracts or Vendor's performance under this Agreement with any of the officers or employees of Vendor having knowledge of such matters.

(d)   <u>Keeping of Records and Books of Account.</u>   Maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate records evidencing Contracts in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Contracts (including, without limitation, records adequate to permit the daily identification of each new Contract and all Collections of and adjustments to each existing Contract ).

(e)   <u>Performance and Compliance with Contracts.</u> At its expense, timely and fully perform and comply with all material provisions, covenants and other promises required to be observed by it under all Contract Documents.

(f)   <u>Location of Records.</u>   Keep its chief place of business and chief executive office, and the office where it keeps its records concerning the Contracts and all other agreements related to such Contracts, at the address of Vendor first above written, or at such other location within the continental United States as Vendor shall provide, upon 30 days' prior written notice to U.S. Bancorp Leasing & Financial.

(g)   <u>Credit and Collection Policies.</u> Comply in all material respects with its credit and collection policies in regard to each Contract.

9

(h) <u>Further Assurances</u>. Vendor will make, execute or endorse, acknowledge, and file or deliver to U.S. Bancorp Leasing & Financial from time to time such schedules, confirmatory assignments, conveyances, reports and other reassurances or instruments and take such further steps relating to the Contracts, the Payments, U.S. Bancorp Leasing & Financial's security interest in the Collateral and the Equipment and the rights covered by this Agreement as U.S. Bancorp Leasing & Financial may request and reasonably require.

(i) <u>Transfer Documents</u>. Vendor will furnish to U.S. Bancorp Leasing & Financial upon request evidence, any bill of lading , certificate of title, and if appropriate, bills of sale or other documents, indicating that Vendor is, immediately before the Closing Date, the record and beneficial owner of the Equipment, the Payments and the Collateral, free and clear of all mortgages, deeds of trust, pledges, and other lien, security interest, charge or encumbrance.

(j) <u>No Fraudulent Activity</u>. Vendor and its Affiliates and their respective agents, distributors, and employees will not commit or participate in any fraudulent act or activity in connection with the performance by them pursuant to a Contract or any Program Agreement.

(k) <u>Payment</u>. To the extent any Payments may come into the possession of Vendor, Vendor will hold same in trust for U.S. Bancorp Leasing & Financial.

5.2    <u>Negative Covenants of Vendor</u>. (a) Vendor shall not, without the prior written consent of U.S. Bancorp Leasing & Financial.

(i) <u>Sales, Liens, Etc</u>. (1) Sell, assign (by operation of law or otherwise) or otherwise dispose of or create or suffer to exist any adverse claim upon or with respect to any Contract or related agreement which U.S. Bancorp Leasing & Financial has purchased pursuant to this Agreement, or upon or with respect to the portion of collections in any lock-box account representing collections from such Contracts, or assign any right to receive income in respect thereof, or (2) further pledge, sell or assign, with or without recourse such Contract; or.

(ii) <u>Extension or Amendment of Contracts</u>. Extend, amend, waive, terminate or otherwise modify the terms of such Contract.

(b)    From the date hereof until payment in full of all Disbursement Balances and termination of this Agreement pursuant to Section 10.2, Vendor shall not, without the prior written consent of U.S. Bancorp Leasing & Financial:

(i) <u>Change in Business or Credit and Collection Practices</u>. Make any change in the character of its business or in its credit or collection practices, which change could, in either case, reasonably be expected to materially impair the collectability of any Contract; or

(i) Sales of Other Assets. Other than in the ordinary course of its business, sell, transfer, convey or lease all or any substantial part of its assets.

5.3    Affirmative Covenant of U.S. Bancorp Leasing & Financial.  From the date hereof, U.S. Bancorp Leasing & Financial shall to the extent the same have not been paid, be solely responsible for payment of all state and local property, sales, use and other similar taxes (and penalties and interest thereon) collected from the Users and received by U.S. Bancorp Leasing & Financial in respect to the Contracts, any Equipment covered by or securing the obligations under the Contracts, and any Payments ("Transaction Taxes") and for filing of any required returns with each appropriate governmental authority with respect thereto.

6.    Delivery of Financial Information.

6.1    Financial Statements. Vendor shall promptly deliver or cause to be delivered to U.S. Bancorp Leasing & Financial (a) after the end at each quarter in each fiscal year of Program Guarantor, and in any event within 45 days after the end of such period and (b), after the end of each fiscal year of Program Guarantor, and in any event within 120 days after the end of such period:

(i)    a balance sheet and income statement of Program Guarantor at the end of such quarterly period and such year; and

(ii)    a statement of material changes of accounting policies, presentations or principles made by Program Guarantor during such year.

Quarterly statements shall be certified by the CFO of such entity as complete and correct and fairly reflecting the financial condition of such entity, in accordance with generally accepted accounting principles. Annual statements shall be audited by an independent certified public accounting firm of national standing. Vendor shall deliver or cause to be delivered to U.S. Bancorp Leasing & Financial such other information concerning the condition (financial or other) of Vendor or Program Guarantor as U.S. Bancorp Leasing & Financial may reasonably request.

7.    Contract Servicing.

7.1    Servicing of Contracts. (a) Until the earlier of (i) the occurrence of a Termination Date under this Agreement or (ii) such time as more than 5% of remaining aggregate Disbursement Balance of the Contracts is more than 60 days past due, or (iii) payment in full of all Disbursement Balances due with respect to any and all outstanding Contracts, or (iv) Vendor defaults under any lock-box intercreditor agreement ("Lock-Box Intercreditor Agreement") among U.S. Bancorp Leasing & Financial, Vendor and Vendor's other Lenders or for any reason such Lock-Box Intercreditor Agreement is terminated or cancelled (it being understood that no such Lock-Box Intercreditor

Agreement exists as of the date of this Agreement and nothing herein shall be construed as obligating U.S. Bancorp Leasing & Financial to enter into such an agreement):

(1)     Vendor shall (A) invoice the Users for all amounts due under the Contracts (including but not limited to all sales, use, personal property, and other Transaction Taxes due under the Contracts) in the name of Vendor (provided, however, that U.S. Bancorp Leasing & Financial will report and remit such Transaction Taxes to the applicable taxing authority in accordance with Section 5.3 of this Agreement) and (B) through its own collection personnel, perform collection activities with respect to any past due amounts under Contracts in the name of Vendor. In conducting Contract servicing under this Section 7, Vendor shall use commercially reasonable and prudent efforts, consistent with the same standard of skill and care Vendor exercises with respect to servicing its own assets and without discrimination in favor of Vendor's own assets or assets it services for the account of others. Vendor shall conduct all Contract servicing in accordance with all applicable laws.

(2)     Vendor shall instruct each User to remit all Payments relating to any Contract subject to this Agreement to Vendor. All Payments collected by Vendor shall be held in trust for U.S. Bancorp Leasing & Financial and remitted to U.S. Bancorp Leasing & Financial by wire transfer of immediately available funds within seven (7) business days after receipt thereof (whether by Vendor's direct receipt from Users, deposit in a lockbox maintained for Vendor's benefit, or receipt by any other intermediary acting on behalf of Vendor), to the bank account specified from time to time by U.S. Bancorp Leasing & Financial by written notice from U.S. Bancorp Leasing & Financial. Without limitation of any of its other rights or remedies, U.S. Bancorp Leasing & Financial may require Vendor to pay U.S. Bancorp Leasing & Financial a late charge equal to five percent (5%) of the amount of any Payments not remitted to U.S. Bancorp Leasing & Financial when due under this Section. Vendor shall also deliver to U.S. Bancorp Leasing & Financial with each remittance (or at such other times as U.S. Bancorp Leasing & Financial may specify) an accounting of the amounts collected, amounts outstanding and other relevant information reasonably required by U.S. Bancorp Leasing & Financial for each Contract in order for U.S. Bancorp Leasing & Financial to reconcile account information, in format acceptable to U.S. Bancorp Leasing & Financial.

(3)     Vendor shall not accept collections, or repossess or consent to the return of the Equipment, or modify the terms of any Contract or User Guaranties, except upon the written request of U.S. Bancorp Leasing & Financial. Vendor shall take no action to repossess, upgrade or exchange Equipment, grant a time extension for Payment or forgive any User's obligations under a Contract without U.S. Bancorp Leasing & Financial's express prior written consent.

(4)     Vendor shall promptly after obtaining knowledge of the occurrence of any default under any Contract, notify U.S. Bancorp Leasing & Financial of the

TOTAL P.02

existence, nature and period of such default and what action, if any, User has taken, is taking, or proposes to take with respect thereto.

(5)   Vendor shall provide periodic reports to U.S. Bancorp Leasing & Financial concerning the Payment history of all Contracts in such form and content as mutually agreed by the parties.

(b)   U.S. Bancorp Leasing & Financial may at any time after a Vendor Servicing Termination Event, by notice to Vendor terminate some or all of Vendor's administrative, servicing or collection duties described in this Agreement, including without limitation, those described in Section 7.1(a). U.S. Bancorp Leasing & Financial may also at any time terminate by notice to Vendor some or all of Vendor's administrative, servicing and collection duties as to any Defaulted Contract. U.S. Bancorp Leasing & Financial may then in either such event immediately and without further notice to Vendor administer, service and collect the affected Contracts in any manner it sees fit, notify any User of the assignment to U.S. Bancorp Leasing & Financial of such Contract and/or direct any User to make all Payments to U.S. Bancorp Leasing & Financial, and file UCC assignments reflecting the assignments of the Contracts and Equipment. Vendor shall, upon U.S. Bancorp Leasing & Financial's demand, immediately deliver to U.S. Bancorp Leasing & Financial any original Contracts not previously delivered and copies of all records regarding the same. Vendor hereby appoints U.S. Bancorp Leasing & Financial as its true and lawful attorney-in-fact (coupled with an interest), with power of substitution, in the name of Vendor (effective immediately in the case of clause 7.1(a) (ii), and effective upon any Vendor Servicing Termination Event in the case of clauses 7.1(a)(i), (iii) and (iv)): to (i) ask, require, demand, receive, compound, and give acquittance for any and all Payments and claims for money due or to become due under any Contract; (ii) endorse checks or other instruments delivered to any lockbox or otherwise received by and constituting Payments, amounts, or sums legally due U.S. Bancorp Leasing & Financial under this Agreement; and (iii) bill and collect from the Users applicable use and property tax.

7.2   No Other Obligations on U.S. Bancorp Leasing & Financial. Except with respect to U.S. Bancorp Leasing & Financial's obligations under Section 5.3, U.S. Bancorp Leasing & Financial does not assume and its interest herein shall not be subject to any of the obligations or liabilities of Vendor under the Contracts assigned hereunder or any duty to bill for or collect money due thereunder or to enforce collection thereof. U.S. Bancorp Leasing & Financial assumes no responsibility, obligation or liability for any representation, warranty or obligation, express or implied, made or deemed made by any agent, employee or Affiliate of Vendor to a User in or in connection with any Contract. Except with respect to U.S. Bancorp Leasing & Financial's obligations under Section 5.3, Vendor hereby covenants and agrees to keep and perform, at its sole cost and expense, all of its obligations under or with respect to the Contracts and the Equipment covered thereby, including any service or maintenance and to save U.S. Bancorp Leasing & Financial harmless from the consequences of and reimburse U.S. Bancorp Leasing & Financial for any costs and expenses incurred as a result of Vendor's failure to perform such obligations.

13

8.    **Repurchase: Substitutions.**

8.1    **Repurchase by Vendor.**  Within 10 days after notice from U.S. Bancorp Leasing & Financial, Vendor shall pay U.S. Bancorp Leasing & Financial its Disbursement Balance with respect to any Contract as to which:

(a)    such Contract is terminated for illegality or invalidity or is determined in a legal proceeding to be unenforceable;

(b)    Vendor breaches any of its representations, warranties or covenants contained in this Agreement as to such Contract or any document related to this Agreement; or

(c)    such Contract is rescinded pursuant to rights granted by operation of law or otherwise as a result of Vendor's conduct, and Vendor fails to cure such breach or avoid such rescission within 30 days after notice from U.S. Bancorp Leasing & Financial

Upon receipt of such Disbursement Balance, U.S. Bancorp Leasing & Financial shall reassign to Vendor such Contract, without recourse, representation or warranty, express or implied.

8.2    **Equipment or Contract Substitution.**

(a)    If any Equipment or Software licensed or furnished by Vendor become, or in Vendor's opinion are likely to become, the subject of a claim of infringement of a patent, trade secret or copyright, Vendor shall within 60 days after becoming aware of the claim, at its option and expense (including any income tax indemnity in the case of a financing of a True Lease) do one of the following: (i) procure for U.S. Bancorp Leasing & Financial and the relevant User, or a subsequent user or purchaser, the right to continue using the Equipment and the Software, (ii) replace or modify the Equipment and Software so that it becomes non-infringing, if the same function is performed by the replacement or modification, or (iii) repurchase the affected Contract(s) by paying to U.S. Bancorp Leasing & Financial the applicable Disbursement Balance(s), subject to the rights of any User under the pertinent Contract, and accept a reassignment of the rights of U.S. Bancorp Leasing & Financial in the relevant Contract and Equipment without recourse, representation or warranty, express or implied.

(b)    Vendor may, at its option and expense (including any income tax indemnity in the case of a financing of a True Lease), exercised by written notice to U.S. Bancorp Leasing & Financial, substitute another contract with similar Payments for a Defaulted Contract or repay the Disbursement Balance of a Defaulted Contract. Vendor shall make such election within ten (10) business days of receipt of a notice from U.S. Bancorp Leasing & Financial under Section 8.1 and make such substitution or payment on the Payment date immediately following the date of such election.

14

(c)    If Vendor elects to substitute a new Contract for a Defaulted Contract, it shall promptly submit to U.S. Bancorp Leasing & Financial a copy of the proposed Financing Request covering the proposed User to be substituted, together with such additional information relating to such Contract and the User or User Guarantor as U.S. Bancorp Leasing & Financial may request. U.S. Bancorp Leasing & Financial may review and approve or reject any such proposed substitute Contract in the same manner as any other Contract, and the conditions precedent and covenants set forth in Section 2 shall be satisfied in connection with the assignment of each substituted Contract to U.S. Bancorp Leasing & Financial. Vendor agrees that if U.S. Bancorp Leasing & Financial, within 10 days following receipt of all information requested by U.S. Bancorp Leasing & Financial with respect to such substitution, notifies Vendor that U.S. Bancorp Leasing & Financial is not, in its sole discretion, satisfied with such substitute User and the documents relating thereto, all the provisions of Section 8.1 shall remain applicable to the affected Contract. Upon any payment or substitution by Vendor, U.S. Bancorp Leasing & Financial will release and assign to Vendor its right, title and interest in the Defaulted Contract and the relevant Equipment, without recourse, representation or warranty express or implied. All representations, warranties and covenants of Vendor set forth in this Agreement shall apply to such substituted Contract, and any such Contract shall be assigned to U.S. Bancorp Leasing & Financial and subject to U.S. Bancorp Leasing & Financial's interest created under this Agreement.

9.    Termination Events

9.1    Termination Events. If any of the following events ("Termination Events") shall occur:

(a)    (i) Vendor shall fail to perform or observe any term, covenant or agreement under this Agreement or any other Program Document (other than as referred to in clause (ii) next following) and such failure shall remain unremedied for 10 business days after notice to Vendor, or (ii) Vendor shall fail to make any payment or deposit to be made by it under this Agreement or any other Program Document when due; or

(b)    Any representation or warranty made or deemed to be made by Vendor (or any of its officers) under or in connection with this Agreement or any other Program Document or any periodic report or other information, certificate or report delivered pursuant hereto shall prove to have been false or incorrect in any material respect when made; or

(c)    There shall be a Material Adverse Change, in the reasonable opinion of U.S. Bancorp Leasing & Financial, as to the Vendor or the Program Guarantor; or

(d)    Vendor ceases to do business as a going concern, becomes bankrupt, makes an assignment for the benefit of creditors or otherwise takes advantage of the bankruptcy or any other law for the relief of debtors or fails generally to pay its recourse debts as they become due, or takes any corporate action in furtherance of any of the foregoing; or

(e)    An involuntary petition is filed under any bankruptcy statute against Vendor, or a custodian, receiver, trustee, or assignee for the benefit of creditors (or similar official) is appointed to take possession of the properties of Vendor and such petition is not dismissed, withdrawn, or otherwise eliminated within 60 days after the filing thereof; or

(f)    The Program Guarantor fails to perform or observe any covenant or agreement required of it under the Program Guaranty, or any representation or warranty shall prove to be materially incorrect, or there occurs in relation to the Program Guarantor any event or circumstance as described in relation to the Vendor at subsection 9(d) or 9(e), or the Program Guarantor contests or denies any obligation under the Program Guaranty;

then, and in any such event and during the continuation of such event, U.S. Bancorp Leasing & Financial may, by notice to Vendor, declare a Termination Date to have occurred, except that, in the case of any event described in subsections (d) and (e) above, the Termination Date shall be deemed to have occurred automatically upon the occurrence of such event. Upon any such Termination Date, U.S. Bancorp Leasing & Financial shall have, in addition to all other rights and remedies under this Agreement or otherwise, all other rights and remedies provided under the UCC of the applicable jurisdiction and other applicable laws, which rights shall be cumulative. Without limiting the foregoing, the occurrence of a Termination Event shall not deny to U.S. Bancorp Leasing & Financial any remedy in addition to termination of U.S. Bancorp Leasing & Financial's undertaking to consider any further Financing Requests under this Agreement to which U.S. Bancorp Leasing & Financial may be otherwise appropriately entitled, whether at law or equity.

10.    **General Provisions.**

10.1    **Independent Contractors.** U.S. Bancorp Leasing & Financial and Vendor are separate entities, each of which has entered into this Agreement for independent business reasons. Vendor and U.S. Bancorp Leasing & Financial are not partners or joint venturers, and neither has acted, acts, or shall be deemed to have acted or act, as an agent for the other.

10.2    Term and Termination.

(a)    This Agreement shall be deemed effective as of the date of execution and delivery by U.S. Bancorp Leasing & Financial and Vendor. The term of this Agreement shall continue from such effective date for two years, renewable on each anniversary date of the Agreement thereafter for additional one-year periods without action by either party, unless terminated by either party. Notwithstanding the foregoing sentence, either party may terminate this Agreement at any time upon at least 60 days' written notice thereof to the other party. In addition, if Vendor or U.S. Bancorp Leasing & Financial breaches any of its representations, warranties or covenants, the other party may

16

terminate this Agreement immediately upon notice to the breaching party. Effective with any termination, U.S. Bancorp Leasing & Financial shall not be required to consider or process any further Financing Requests and U.S. Bancorp Leasing & Financial shall have no obligation to fund any Approvals not yet fully funded.

(b)     Notwithstanding any termination of this Agreement by either party, the obligations of Vendor under this Agreement, and of U.S. Bancorp Leasing & Financial under Sections 4.3 and 5.3 of this Agreement, shall remain in full force and effect until all Disbursement Balances, all other amounts due to U.S. Bancorp Leasing & Financial under this Agreement, all interest thereon, and all other obligations of Vendor under this agreement have either been paid in full or otherwise discharged in a manner satisfactory to U.S. Bancorp Leasing & Financial. Without limiting the generality of the foregoing, the obligations of Vendor under Sections 4 and 8 and under the Support Agreement, and of U.S. Bancorp Leasing & Financial under Section 4.3 and 5.3 of this Agreement, shall survive any such termination to the extent necessary for their full effectuation.

10.3     Accounting. U.S. Bancorp Leasing & Financial and Vendor shall cooperate with each other by furnishing, subject to their respective internal policies, such records and supporting material relating to Payments under this Agreement or under the Contracts as may be reasonably requested if either party is audited by any taxing authority.

10.4     Arbitration. Any controversy or claim between the parties arising out of or relating to this Agreement or any related agreements or instruments and any claim based upon or arising from an alleged tort, shall at the request of either Vendor or U.S. Bancorp Leasing & Financial be determined by arbitration before a single arbitrator. Such requesting party shall give to the other a notice of dispute, adequately identifying and providing details of the dispute. Any such matter shall be arbitrated under Title 35 of the United States Code, as interpreted by the United States Court of Appeals for the Federal Circuit, and pursuant to Title 9 of the United States Code, commonly referred to as the Federal Arbitration Act. The Arbitration Rules of the Center for Public Resources, New York, New York, for Non-Administered Arbitration of Business Disputes, as they existed on the date of this Agreement, are adopted as the rules governing this arbitration. The arbitrator shall give effect to statutes of limitation in determining any claim. Any controversy concerning whether an issue is arbitrable shall be determined by the arbitrator(s). Judgment on the arbitration award may be entered in any court having jurisdiction. The institution and maintenance of any action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief. No provision of this Section shall limit the right of any party to this Agreement to exercise self-help remedies such as setoff, to foreclose against or sell any real or personal property collateral or security, or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, after, or during the pendency of any arbitration or other proceedings. The exercise of a remedy does not waive the right of either party to resort to arbitration.

10.5   Jury Trial Waiver, Etc. SUBJECT TO THE ARBITRATION PROVISION OF SECTION 10.4, EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND (REGARDLESS OF THE THEORY OF LIABILITY SUCH AS TORT AND NON-TORT THEORIES) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER PROGRAM DOCUMENTS, OR THE COLLATERAL. VENDOR AND U.S. BANCORP LEASING & FINANCIAL EACH EXPRESSLY ACKNOWLEDGE THE INCLUSION OF THIS JURY TRIAL WAIVER THROUGH THE INITIALS OF THEIR RESPECTIVE DULY AUTHORIZED REPRESENTATIVE.

VENDOR INITIALS

U.S. Bancorp Leasing & Financial INITIALS

10.6   Assignability. The rights and obligations of Vendor under this Agreement may not be assigned without the written consent of U.S. Bancorp Leasing & Financial, which consent may be withheld or conditioned by U.S. Bancorp Leasing & Financial in its sole discretion. Upon no less than five business days notice prior to the effective date thereof, U.S. Bancorp Leasing & Financial may assign its interest in any Contract to any third party, together with all rights under this Agreement, provided that U.S. Bancorp Leasing & Financial shall continue to be subject to the obligations under Section 5.3 of this Agreement and that any such assignee shall be subject to the same restrictions as U.S. Bancorp Leasing & Financial under this Agreement, including as to notification of Users of assignments and servicing by Vendor, but such assignee shall have none of the obligations of U.S. Bancorp Leasing & Financial under this Agreement and Vendor will not assert against such assignee any defense, counterclaim, or offset that Vendor may have against U.S. Bancorp Leasing & Financial. Vendor shall cooperate with U.S. Bancorp Leasing & Financial in executing any documentation reasonably requested by U.S. Bancorp Leasing & Financial or any assignee of U.S. Bancorp Leasing & Financial to effectuate any such assignment. Vendor may repurchase any such Contract, provided (i) irrevocable notice is given to U.S. Bancorp Leasing & Financial no later than three business days after notice of such assignment was given by U.S. Bancorp Leasing & Financial to Vendor; (ii) Vendor shall pay U.S. Bancorp Leasing & Financial its Disbursement Balance in respect of such Contract by no later than two business days after the date of irrevocable notice in clause (i), and (iii) such repurchase and reassignment is without recourse, representation or warranty, expressed or implied.

10.7   Notices. All notices, requests and other communications under this Agreement shall be deemed to have been given or made if mailed, postage prepaid, by registered or certified mail, return receipt requested, or confirmed facsimile transmission, or sent by overnight courier to the other party at the address stated below each party's signature or such other address as such party may have provided by notice.

10.8   _Miscellaneous._   Section headings appearing in this Agreement are for convenience of reference only and shall not modify, define, expand or limit any of the terms or provisions hereof. The parties agree that this Agreement has been executed and delivered in, and shall be construed in accordance with the laws of Tennessee. If any provision of this Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement. This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and incorporates all representations made in connection with negotiation of the same. The terms hereof may not be terminated, amended, supplemented or modified orally, but only by an instrument duly authorized by each of the parties hereto. This Agreement and any amendments hereto shall be binding on and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns. Two or more duplicate originals of this Agreement may be signed by the parties hereto, all of which together shall constitute one and the same original agreement.

10.9   _Limitation of Liability._   Neither party hereto shall be liable to the other in any event for any incidental, punitive, special, or consequential damages regardless of the form of the action except with respect to a party's obligations to indemnify the other for such damages pursuant to Section 4.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

ASTEC FINANCIAL SERVICES, INC.

By: _____

Title: _President_

Address:    1725 Shepherd Road
            Chattanooga, TN 37421
Telephone:  (423) 899-5898
Fax No:     (423) 899-4456

U.S. Bancorp Leasing & Financial

By: _____

Title: _Exec. VP_

Address:    P.O. Box 2177
            Tualatin, OR 97062-2177
Telephone:  (800) 253-3468
Fax No:     (503) 797-0490

## DEFINITIONS

"**Affiliate**" means, in respect of any person or entity, any other person or entity that is controlled by, in control of or under common control with, such person or entity.

"**Approval**" means U.S. Bancorp Leasing & Financial's written approval of a Financing Request.

"**Closing Date**" means each date of an advance of a Disbursement Amount under this Agreement.

"**Collateral**" means any and all Vendor's right, title and interest in and to all Contracts and other Contract Documents now existing or hereafter arising, together with all payment and performance obligations thereunder, all accounts, general intangibles, chattel paper, instruments and documents relating thereto, all equipment relating thereto, including software rights and patents, trade marks and copyrights relating thereto, any lock-box account relating thereto, and all funds and proceeds now or hereafter deposited therein, all Payments received or receivable, and all proceeds of the foregoing.

"**Conforming Contract**" means a Contract satisfying each of the following requirements or characteristics as of the Closing Date relating thereto:

    (i)    The contract was originated in the United States and with respect to such Contract, Scheduled Payments are payable in U.S. dollars by Users domiciled in the United States;

    (ii)    No User with respect to the Contract is an Affiliate of Vendor;

    (iii)    To the extent the Contract permits the User to terminate such Contract prior to the scheduled expiration date of the firm term of such Contract, in connection with any such termination the User is obligated contractually to pay an amount not less than U.S. Bancorp Leasing & Financial's Disbursement Balance applicable to such Contract;

    (iv)    The form of the Contract is as attached hereto as Exhibit B-2, or is one previously provided to U.S. Bancorp Leasing & Financial and approved by U.S. Bancorp Leasing & Financial for purposes of this Agreement, or is otherwise in form and substance satisfactory to U.S. Bancorp Leasing & Financial;

    (v)    The User under such Contract is personally liable for the payment and performance of its obligations under the Contract Pursuant to the terms of the

Contract, and is absolutely required to make all payments and perform all obligations due pursuant to such Contract without abatement, deferment or defense of any kind or for any reason (except as the same by be limited by bankruptcy, insolvency, rights and by general principles of equity). The Contract is not subject to any rights of rescission, set-off, counterclaim, abatement or defense, including (without limitation) any defense of usury, nor will the operation of any terms of the Contract or the exercise of any right or remedy thereunder, render such Contract or the obligations thereunder unenforceable, or subject the same to any right of rescission, set-off counterclaim, abatement or defense. No User under the Contract has asserted any such right of rescission, set-off, counterclaim, abatement or defense to its obligations under its Contract;

(vi)    The contract requires the User thereunder at its own cost and expense to maintain the Equipment leased or financed thereunder in good repair, condition and working order, and to the best knowledge of Vendor, the User is in compliance with this requirement as of the Closing Date applicable to such Contract;

(vii)    The Contract requires the User to pay all fees, taxes (except net income taxes), and other charges or liabilities arising with respect to the Equipment leased or financed thereunder or the use thereof, to keep the Equipment free and clear of any and all liens, security interests and other encumbrances (other than the security interest assigned to U.S. Bancorp Leasing & Financial), to indemnify and hold harmless the lessor or secured party thereunder and its successors and assigns against the imposition of any such fees, charges, liabilities and encumbrances, to bear all risk of tees associated with the Equipment covered by or securing the obligations under Contract during the term of such Contract;

(viii)    The Contract prohibits without prior notice to lessor or secured party any change in location at which such Equipment is customarily housed or kept, and if relating to Equipment consisting of goods that are mobile and of a type normally used in more than one jurisdiction, prohibits without the lessor's or secured party's prior written consent any relocation of the Equipment into a different state, and requires the User to execute such agreements and documents as may reasonably be requested by the lessor or secured party in connection with any such relocation;

(ix)    The User under the terms of any Contract requiring that such User's consent first be obtained prior to any assignment of or grant of security interest in such Contract and the Equipment related thereto has consented to an assignment of such Contract and to the grant of a security interest in and to the Equipment relating thereto to U.S. Bancorp Leasing & Financial. Except for the Contracts described in the immediately preceding sentence, no agreement with any User requires the consent or approval of or notice to the User with respect to the assignment and transfer by Vendor of Vendor's right, title and interest in and to the Contracts and Scheduled Payments and Vendor's grant of a security interest in the Collateral;

(x)     All Equipment relating to the Contract is located within the United States;

(xi)    The Contract involves the lease of tangible personal property and related software or the loan of money secured by a security interest in tangible personal property and related software owned by the User; and

(xii)   Vendor has not received any notice challenging its ownership or the priority of its security interest in the Equipment under such Contract, and there are no proceedings or investigations pending, or, to the best of the Vendor's knowledge after due inquiry, threatened, before any court, regulatory body, administrative agency, or other tribunal or governmental instrumentality, (i) asserting the invalidity of the Contract, (ii) seeking to prevent payment and performance of the Contract, or (iii) seeking any determination or ruling that might adversely affect the validity or enforceability of the Contract.

"**Contract**" means a True Lease, LIAS or PMSI (each a "type" of Contract) as to which Vendor is, prior to its transfer to U.S. Bancorp Leasing & Financial hereunder, lessor or secured party thereunder, and which is the subject of a Financing Request not rejected by U.S. Bancorp Leasing & Financial under this Agreement.

"**Contract Documents**" means, in respect of any Contract, the Contract, together with any guaranty, security agreement, lockbox agreement, financing statements, promissory note, loan agreement, purchase order or other document or agreement delivered or intended to be delivered by or to Vendor in connection therewith, together with any and all schedules, appendices, annexes, amendments and waivers pertaining thereto.

"**Defaulted Contract**" means a Contract under which (i) any payment or other amount due under such Contract is 61 days or more past due, (ii) a default, event of default or termination event (or similar event) as defined in the Contract has occurred and is continuing, or (iii) the User has failed to perform or comply with any other material obligation or covenant.

"**Disbursement Amount**" means each disbursement of funds by U.S. Bancorp Leasing & Financial with respect to a Portfolio and each Contract therein.

"**Disbursement Balance**" of a Contract as of any date of determination shall mean the sum of (i) all unpaid Scheduled Payments and other amounts currently due under the Contract, (ii) the remaining Payments under the Contract, discounted at the applicable Discount Rate for such Contract as determined by U.S. Bancorp Leasing & Financial, (iii) the Booked Residual (if any, and to the extent not reflected in clause (ii) of this definition) (as defined in the Support Agreement) in respect of such Contract, and (iv) all initial direct costs, charges and expenses reasonably incurred by U.S. Bancorp Leasing & Financial in connection with the Contract.

"**Discount Rate**" means a fixed annual rate expressed as a percentage and listed in the applicable Financing Request.

"**Equipment**" means each item of tangible personal property leased under a Contract which is a True Lease, or in which Vendor (and U.S. Bancorp Leasing & Financial, following the purchase of such Contract by U.S. Bancorp Leasing & Financial) has a security interest under a Contract which is a LIAS or PMSI, together with all Software incorporated therein.

"**Financial Statements**" means the quarterly and annual statements relating to the Program Guarantor as described in Section 6.

"**Financing Request**" means a request submitted to U.S. Bancorp Leasing & Financial in the form of Exhibit B-3 in which the Vendor describes a collection of proposed Users and Contracts.

"**LIAS**" means a lease intended as security which the User is intended to be the owner of the Equipment under applicable commercial and federal income tax laws.

"**Losses**" means any and all claims, liabilities, demands, expenses, interest, penalties and proceedings whatsoever involving or affecting U.S. Bancorp Leasing & Financial (including, without limitation, reasonable attorneys' fees and allocated time charges of internal counsel).

"**Material Adverse Change**" means, in respect of any person or entity, a material adverse change in (i) the business, operations, properties or financial or other condition or prospects of such person or entity, or (ii) the ability of any person that is the Vendor or the Program Guarantor to pay and perform its obligations any Program Document.

"**Payments**" means payments of any kind whatsoever, including general intangibles and chattel paper, payable by a User under a Contract to Vendor or U.S. Bancorp Leasing & Financial, and under any related instruments and documents now or hereafter evidencing the obligations of User, including without limitation all rents and other moneys at any time due and payable under the Contract, and insurance and condemnation proceeds.

"**PMSI**" means a purchase money security interest securing a loan made to a User for the purpose of financing the acquisition of Equipment by such User.

"**Portfolio**" means a group or collection of Contracts that are or were the subject of a Financing Request.

"**Program Documents**" means this Agreement, together with all riders, attachments, exhibits and annexes hereto, the Program Guaranty, the lock-box agreement pertaining to the Lock-box Account and all other documents and agreements listed at Exhibit B hereto or delivered in connection with any Closing Date.

"**Program Guaranty**" means that guaranty in the form of Exhibit B-8 hereto executed by the Program Guarantor.

"Scheduled Payments" means the periodic rental payments or installments of principal and interest scheduled to be paid during the remaining term under the terms of the respective Contracts on and after their respective Closing Dates.

"Services" means services related to the Software License, including but not limited to maintenance, training, support and consulting.

"Settlement Date" means the date which is thirty (30) days from the applicable Closing Date and the same day of each month thereafter.

"Software" means the software licensed pursuant to a Software License with Vendor or with any third party approved by U.S. Bancorp Leasing & Financial and subject to a Contract.

"Software License" means any standard software licensing and services agreement between Vendor and a User or between a third party approved by U.S. Bancorp Leasing & Financial and a User.

"Support Agreement" means the agreement entered into between Vendor and U.S. Bancorp Leasing & Financial substantially in the form of Exhibit B-7.

"Termination Date" means the date on which a Termination Event is deemed to have occurred or is declared by U.S. Bancorp Leasing & Financial to have occurred pursuant to Section 9.1.

"Termination Event" is as defined in Section 9.1.

"True Lease" means a lease where the Vendor is intended to be the owner of the Equipment under applicable commercial and federal income tax laws.

"UCC" means the Uniform Commercial Code in effect in any applicable jurisdiction.

"User" means the person or entity obligated to make Payments under a Contract, as well as any person or entity who has guaranteed any or all of the obligations under a Contract.

"User Guarantor" means the guarantor of a User's obligations under a Contract.

"User Guaranty" means the guaranty by a User Guarantor of a User's obligations under a Contract.

"Vendor Servicing Termination Event" means any of the events or circumstances described in clause (i) or (ii) of the introductory clause of Section 7.1(a).

## DOCUMENTATION REQUIREMENTS

1.   <u>Documents Required for Each Funding</u>.  U.S. Bancorp Leasing & Financial's obligation to make a Disbursement on each Closing Date in respect of any Portfolio that is the subject of a Financing Request is subject to receipt of the Financing Request in the form of <u>Exhibit B-3</u>, a Compliance Certificate in the form of <u>Exhibit B-9</u>, and in respect of the initial funding the documents listed at paragraph 2 below and, with respect to each Contract to be financed, the following documents, all in form and substance acceptable to U.S. Bancorp Leasing & Financial and duly executed and delivered:

(a)   an Assignment in the form of <u>Exhibit B-1</u>;

(b)   the original Contract, which shall be in the form of <u>Exhibit B-2</u> or other approved form and completed in a manner satisfactory to U.S. Bancorp Leasing & Financial;

(c)   a Vendor Invoice in the form customarily used by Vendor and otherwise acceptable to U.S. Bancorp Leasing & Financial;

(d)   a Certificate of Delivery and Acceptance in the form and substance satisfactory to U.S. Bancorp Leasing & Financial;

(e)   a UCC-1 Financing Statement (User) naming the User as debtor or lessee, Vendor as secured party or lessor and U.S. Bancorp Leasing & Financial as assignee, and describing the relevant Equipment and any related Software and ancillary property;

(f)   if any Equipment is a titled vehicle, a duly-executed release of lien or ownership upon or appended to the original title certificate, together with copies of any previously filed motor vehicle applications, MSOs, and a Power of Attorney from Vendor designating U.S. Bancorp Leasing & Financial as attorney in order to file applications and take other actions to accomplish transfer of title or lienholder status;

(g)   a User Guaranty of a User's obligations, if specified in the Approval or otherwise provided to Vendor, in the form and substance satisfactory to U.S. Bancorp Leasing & Financial;

(h)   a Notice of Assignment in the form of <u>Exhibit B-4</u>, to be held by U.S. Bancorp Leasing & Financial until the Termination Date;

(i)   a Bill of Sale in the form of <u>Exhibit B-5</u>, further evidencing Vendor's sale, transfer and conveyance of title and interest in and to the Equipment relating to the Contract;

(j)   an Insurance Certificate evidencing the existence of insurance required under the Contract;

(k)      any other documentation required to perfect a first priority security interest in any Equipment which is subject to a PMSI or LIAS;

(l)      User corporate/partnership/LLC authorizing resolutions and incumbency certificates, as appropriate;

(m)      any legal opinions obtained for the Transaction;

(n)      Sales Tax Exemption Certificate, if applicable; and

(p)      such other documents or instruments as U.S. Bancorp Leasing & Financial may request in or subsequent to the Approval.

2.      <u>Documents Required Before First Funding Only</u>. On or before the first Closing Date, Vendor shall, at its sole expense, deliver to U.S. Bancorp Leasing & Financial:

(a)      a UCC-1 Financing Statement (Vendor) naming Vendor as debtor and U.S. Bancorp Leasing & Financial as secured party, and describing the Collateral;

(b)      a Certificate of Vendor of the Secretary or Assistant Secretary of Vendor, certifying the existence of resolutions authorizing the documents to be signed by Vendor and the incumbency of Vendors signing officers;

(c)      an Opinion of Counsel in the form of <u>Exhibit B-6</u>;

(d)      a Guaranty of Vendor's obligations in the form of <u>Exhibit B-8</u>; and

(e)      a Support Agreement Rider in the form of <u>Exhibit B-7</u>.

FORM OF ASSIGNMENT
ASSIGNMENT

FOR VALUE RECEIVED, Astec Financial Services, Inc., a Tennessee corporation ("Seller"), hereby assigns, sells, and transfers to U.S. Bancorp Leasing & Financial ("Buyer"), its successors-and-assigns, as expressly provided in a certain Financing Program Agreement dated DATE, between Buyer and Seller ("Agreement"), all of Seller's right, title, and interest in and to the Contracts described on the attached Annex I hereto, all payments due and to become due under such Contracts as of the Closing Date, and all right, title and interest of Seller in and to the Equipment described in any Contract, and all of Seller's rights and remedies under such Contracts, and the right either in Buyer's own behalf or in Seller's name to take all such proceedings, legal, equitable, or otherwise, that Seller might take, save for this assignment ("Assignment").

Seller hereby waives and releases any right, title or interest that it may have (whether pursuant to a "cross-collateralization" provision or otherwise) in and to any Contracts, Equipment, and other interests included in the above described Assignment.

This Assignment is delivered pursuant to the terms of the Agreement and is subject to the terms, conditions, promises, and warranties contained in the Agreement. Capitalized terms not defined herein shall have the meanings given to such terms in the Agreement.

Seller warrants that as of the date of this Assignment the information contained in the attached Annex A is true and correct, descriptions of agreements, equipment, and parties are accurate, and Seller will comply with all of its warranties and other obligations in connection with the Agreement and this Assignment.

All of Seller's right, title, and interest herein assigned may be reassigned by Buyer and any subsequent assignee.

IN WITNESS WHEREOF, Seller has executed this Assignment by its duly authorized representative as of DATE.

"ASSIGNOR"

ASTEC FINANCIAL SERVICES, INC.
a Tennessee corporation

By: _____

Its: _____

## AMENDMENT TO EXHIBIT B-1
### Form of Assignment

The following paragraph is hereby added to Exhibit B-1 signed December 13, 2000.

Notwithstanding anything to the contrary in the Agreement (or any related document), Seller hereby agrees that, in the event of any default by Grubbs Construction Company ("Obligor") under its contract (the "Contract"), Buyer shall have recourse to Seller for 25% of the total outstanding amount then due and owing under the Contract, provided that in the event (i) the Obligor makes the first 12 payments (exclusive of any advance rentals or security deposits) under the Contract in a timely fashion when due, and (ii) there has been, in the sole determination of Buyer, no material adverse change in the Obligor's operations, financial affairs or business condition as of the date of the last such prompt monthly payment under the Contract, and (iii) there has been no event of default under the Contract as of such date, Buyer may agree to reduce the recourse percentage to no less than 15% and it will remain at that level for the remaining portion of the Contract term, and, if Buyer decides to retain the recourse level above 15%, Buyer will annually review the decision under the conditions described above, and may, in its sole discretion, decide to reduce the recourse level to no less than 15% at any annual review.

Except as amended herein all other terms remain in full force and effect.

Assignor
Astec Financial Services, Inc.

By: _Stephen C. Anderson_

Its: _Vice President_

Exhibit <u>B-5</u> to
<u>Financing Program Agreement</u>

<u>Bill of Sale</u>

FOR VALUE RECEIVED, the undersigned ("Seller") hereby sells, transfers and conveys to U.S. Bancorp Leasing & Financial, an Oregon corporation ("Buyer") all seller's right, title and interest in and to the equipment ("Equipment") described below.  THE EQUIPMENT IS SOLD "AS IS" AND WHEREVER NOW LOCATED WITHOUT AND WARRNATY EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THAT FINANCING PROGRAM AGREEMENT DATED AS OF DATE, BETWEEN BUYER AND SELLER.  EXCEPT AS EXPRESSLY SET FORTH IN SUCH AGREEMENT, SELLER HAS NOT MADE, AND DOES NOT HEREBY MAKE ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE TITLE, MERCHANTABILITY, CONDITION, QUALITY, DESCRIPTION, DURABILITY, OR SUITABILITY OF SUCH EQUIPMENT IN ANY RESPECT OR IN CONNECTION WITH OR FOR THE PURPOSES AND USES OF BUYER.

Description of equipment

| | Model | Serial Number |
|---|---|---|
| Astec Portable 8' Double Barrel Plant | | |

"Debtor"  Grubbs Construction Company       Contract Number  *0000573001*
Dated as of the 22 day of December, 2000

Astec Financial Services, Inc.

By: _____

Title: _____

## VENDOR EQUIPMENT SUPPORT,
## REMARKETING AND LOSS POOL AGREEMENT RIDER

THIS VENDOR EQUIPMENT SUPPORT, REMARKETING AND LOSS POOL AGREEMENT RIDER ("Support Agreement" or "Rider") is dated as of __June 1, 2001__, and is attached to and hereby made a part of a Financing Program Agreement dated as of __June 1, 2001__, (the "Agreement") between U.S. Bancorp Leasing & Financial an Oregon corporation, and **ASTEC FINANCIAL SERVICES, INC.** ("Vendor"), a Tennessee corporation. Vendor and U.S. Bancorp Leasing & Financial hereby affirm the Agreement to which this Equipment Support Rider is attached and incorporate it into the Agreement by this reference.

### CERTAIN DEFINITIONS

In addition to the Definitions contained in Exhibit A, the following capitalized terms used in this Support Rider shall have the meanings specified below:

"**Booked Residual**" means the amount shown on U.S. Bancorp Leasing & Financial's books as the residual amount it expects to realize with respect to Equipment subject to a Contract.

"**Enforcement Expenses**" means all costs and expenses, including attorneys fees and the allocated cost of internal counsel, incurred by U.S. Bancorp Leasing & Financial or Vendor in connection with the enforcement or attempted enforcement of any Defaulted Contract.

"**Enhancements**" means engineering changes, software enhancements, additions, and such other Equipment changes or enhancements which improve the performance, safety, or extend the product life or utility of any Equipment.

"**Equipment Recertification Letter**" means a letter from Vendor or Manufacturer certifying that each item of Equipment is operating at the then current manufacturer's specifications for the specific equipment model including, but not limited to, being at all release, revision and engineering change levels for both the hardware and/or Software which at Vendor's sole discretion is necessary to obtain a Vendor or Manufacturer recertification.

"**Maintenance Agreements**" means fixed price maintenance agreements (if any) under which Vendor or Manufacturer agrees to support and maintain the Equipment.

"**Manufacturer**" means the manufacturer of the Equipment.

"Non-Recourse Contract" means any Contract that the applicable Approval specifies is not subject to the "Recourse Pool Amount" provisions of the Support Agreement.

"Recourse Amount" means, (i) in respect of a Defaulted Contract, other than a Non-Recourse Contract, that is a True Lease, an amount equal to 15 percent (15%) of the following amount: (a) the Disbursement Amount paid by U.S. Bancorp Leasing & Financial to Vendor such True Lease; less (b) all Scheduled Payments made by the User under such True Lease since the date the Disbursement Amount was paid by U.S. Bancorp to Vendor for such True Lease; and (ii) in respect of a Defaulted Contract, other than a Non-Recourse Contract, that is an LIAS or a PMSI, an amount equal to 15 percent (15%) of an amount equal to: (a) the aggregate Disbursement Amount paid by U.S. Bancorp Leasing & Financial to Vendor such LIAS or PMSI; less (b) all Scheduled Payments made by the User under such LIAS or PMSI since the date the Disbursement Amount was paid by U.S. Bancorp to Vendor for such LIAS or PMSI. The Recourse Amount shall be the maximum measure of Vendor's recourse liability to U.S. Bancorp Leasing & Financial under Section 1.10 of this Agreement for any Contract for which the underlying Equipment is repossessed from or returned by a User under a Defaulted Contract.

"Remarketing Loss" means, as of any date of determination, the Disbursement Balance with respect to a Defaulted Contract, minus any Remarketing Proceeds if any, from the relevant Equipment.

"Remarketing Proceeds" means (i) in respect of any re-sale, the gross proceeds received upon such re-sale of the relevant Equipment , minus Selling Expenses (approved in advance by U.S. Bancorp Leasing & Financial in the case of Vendor's Selling Expenses) and Enforcement Expenses (approved in advance by U.S. Bancorp Leasing & Financial in the case of Vendor's Enforcement Expenses) and (ii) in the cases of re-lease, the present value of the total rental stream of the initial term of such replacement lease, discounted at the implicit rate for such lease, minus Selling Expenses (approved in advance by U.S. Bancorp Leasing & Financial in the case of Vendor's Selling Expenses) and Enforcement Expenses (approved in advance by U.S. Bancorp Leasing & Financial in the case of Vendor's Enforcement Expenses).

"Replacement Equipment" means "like-kind" equipment within the meaning of the Internal Revenue Code that replaces Equipment subject to a Contract for reasons of maintenance, service, or Equipment malfunction.

"Repossessed Equipment" means Equipment subject to a Defaulted Contract repossessed from or returned by a User.

"Residual Guaranty" means the recourse to Vendor described in Section SA 1.10 below for certain shortfalls in connection with Returned Equipment.

"Returned Equipment" means Equipment returned upon expiration of a True Lease.

"Selling Expenses" means expenses incurred by Vendor or U.S. Bancorp Leasing & Financial for parts, labor, shipping, handling and transportation, but excludes expenses for storage.

"**Support Period**" means the period, including any extensions or renewals, during which a Contract is effective.

"**Upgrades**" means additions, modifications, upgrades, or enhancements to the Equipment requested by a User.

## AGREEMENT

SA 1.1 <u>Vendor Product Support</u>. At all times during the Support Period for any Contract subject to the Agreement, Vendor shall provide or cause the Manufacturer to provide all marketing, training, and field service support to U.S. Bancorp Leasing & Financial substantially similar to that provided to other users of similar equipment at costs no less favorable than those offered to other customers similarly situated, and shall provide or cause to be provided the same to Users, subsequent users, or U.S. Bancorp Leasing & Financial at Vendor's or such Manufacturer's list prices less applicable discounts. Vendor shall advise U.S. Bancorp Leasing & Financial on a non-disclosure basis (as soon as practical) of the Manufacturer's intent to discontinue any product.

SA 1.2 <u>Equipment Enhancements</u>. At all times during the Support Period for any Contract subject to the Agreement, Vendor shall provide or cause the Manufacturer to provide to U.S. Bancorp Leasing & Financial and/or Users, purchasers, or subsequent users of Equipment all Enhancements at amounts no less favorable than those offered to other customers similarly situated; <u>provided that no charges shall be applicable for Enhancements which are generally provided free of additional charge or are required to be provided without charge under the applicable Maintenance Agreement, warranty, indemnity or license.</u>

SA 1.3 <u>Maintenance Agreements</u>. If the Disbursement Amount for any Contract includes prepaid maintenance and the applicable Contract terminates before the expiration of any prepaid Maintenance Agreement, Vendor agrees (and shall ensure) that the remainder of such prepaid Maintenance Agreement shell be transferable to the next user without additional cost subject to the terms and conditions of the original Maintenance Agreement, or if not so transferable, that Vendor will repurchase such amounts at the portion of the Disbursement Balance attributable to the portion of the Disbursement Amount represented by maintenance and service obligations.

SA 1.4 <u>Upgrades and Replacements</u>.

a)   During the term of any Contract, a User may request Upgrades to Equipment which may be supplied or procured by Vendor and leased or financed by Vendor or U.S. Bancorp Leasing & Financial. If a User requests Upgrades to original Equipment, Vendor shall obtain and offer to sell such Upgrades to U.S. Bancorp Leasing & Financial. U.S. Bancorp Leasing & Financial shall have right of first refusal of the financing of all Upgrades. If U.S. Bancorp Leasing & Financial does not purchase or finance such Upgrade and Vendor provides it to a User or causes it to be provided to a

User, then Vendor shall not convey title to or a security interest in such Upgrade to any party other than U.S. Bancorp Leasing & Financial or User. Vendor shall remove or shall cause User to remove any such Upgrade at the expiration of the Contract or, if such Upgrade is not removed, then it shall become the property of U.S. Bancorp Leasing & Financial. If such Upgrade is removed, Vendor shall replace or shall cause the User to replace or repair any original Equipment in order to restore the Equipment to its original design, function, and specifications which existed before such Upgrade, all at Vendor's expense.

(b)    If Equipment subject to a Contract is replaced with Replacement Equipment during the term of the Contract by Vendor or any Manufacturer for reasons of maintenance, service, or Equipment malfunction, such Replacement Equipment shall become the property of U.S. Bancorp Leasing & Financial upon its delivery to the User and shall immediately be considered part of the Equipment subject to the applicable Contract and subject to the terms of this Agreement. Replacement Equipment shall be provided by Vendor to User at no cost to U.S. Bancorp Leasing & Financial and upon written notice to U.S. Bancorp Leasing & Financial (other than for routine replacement of parts or components) and will have performance specifications equal to or greater than original Equipment. Upon this substitution, U.S. Bancorp Leasing & Financial shall release all right, title and interest in the replaced Equipment, and the parties agree to execute and Vendor agrees to cause User and any Manufacturer to execute appropriate documents as necessary to reflect or perfect the passage of title or security interest in the Replacement Equipment to U.S. Bancorp Leasing & Financial.

(c)    At all times during the Support Period, Vendor shall sell or cause to be sold to Users and/or U.S. Bancorp Leasing & Financial any Upgrades which it or its Affiliates generally offers for sale to any customer and any required installation services at nondiscriminatory prices.

SA 1.5  Software/Licensing.

(a)    Vendor will allow and provide, or cause to be allowed and provided, for the transfer of all related Software licenses to any subsequent Equipment users, provided that the next user execute(s) Vendor's or other licensor's standard form Software license agreement and pays any applicable Software transfer fee. Vendor will also license or cause to be licensed any upgraded Software offerings to subsequent users upon the User's payment of any applicable license fees and execution of the applicable Vendor's standard license agreement. Vendor will notify U.S. Bancorp Leasing & Financial of the existence of any Software transfer fee at the time of purchase or assignment of a Contract. In no event will Vendor or any of its Affiliates charge a Software transfer fee for Software originally licensed (including any upgrades), pursuant to a Contract when either (i) no such transfer fee existed or (ii) U.S. Bancorp Leasing & Financial was not notified of any such transfer fee, at the time of purchase of the original Contract.

(b)    Vendor hereby, on its own behalf and on behalf of each of its Affiliates, grants to U.S. Bancorp Leasing & Financial a nontransferable, nonexclusive license to

use the Software in connection with Equipment and as authorized in the Agreement. U.S. Bancorp Leasing & Financial shall, subject to the provisions of this Agreement, (i) hold Software in confidence and inform its employees, agents and consultants who require disclosure in connection with U.S. Bancorp Leasing & Financial's use and lease of Equipment of the proprietary and confidential nature of such Software, (ii) not print, copy, modify, translate, alter, reverse compile, decompile or reverse engineer the Software (except copies for backup capability purposes, if applicable), (iii) not remove any Vendor copyright, trademark, or other proprietary notice from the Software, and (iv) not transfer Software or assign any license or rights regarding Software, except as otherwise provided in this Agreement. Any other attempted transfer or assignment by U.S. Bancorp Leasing & Financial shall be void and of no force or effect. These obligations shall survive any termination or expiration of the Agreement or of licenses granted under this Section. If U.S. Bancorp Leasing & Financial does not remedy any breach of these obligations within 10 days following written notice from Vendor describing the breach (unless U.S. Bancorp Leasing & Financial has diligently attempted to cure said breach, then such longer period as the parties may agree), Vendor may, in addition to any other legal or equitable remedies available to it, immediately terminate the non-exclusive license granted to U.S. Bancorp Leasing & Financial with respect to the applicable Contracts affected by such breach.

SA 1.6   <u>Vendor's Remarketing Services Upon Termination or User Default</u>.   Upon termination for any reason of any True Lease for which U.S. Bancorp Leasing & Financial has financed or purchased the residual position, or upon U.S. Bancorp Leasing & Financial's determination that any Contract is a Defaulted Contract, U.S. Bancorp Leasing & Financial may request Vendor to accept redelivery of or repossess the relevant Equipment on U.S. Bancorp Leasing & Financial's behalf as promptly and efficiently as is legally permissible. Thereafter, Vendor shall, in relation to such Contract and Equipment, until otherwise instructed by U.S. Bancorp Leasing & Financial.

(a)    accept Repossessed Equipment or Returned Equipment or otherwise use best efforts to repossess the relevant Equipment to the extent legally permissible and, to the extent not done by the User, at U.S. Bancorp Leasing & Financial's expense (provided U.S. Bancorp Leasing & Financial preapproves the same), supply proper handling, loading, and shipping of the Repossessed Equipment or Returned Equipment so obtained by Vendor from where it is then located to Vendor's premises or any other location agreed to by U.S. Bancorp Leasing & Financial and Vendor;

(b)    advise and make a recommendation to U.S. Bancorp Leasing & Financial regarding the necessity, advisability, and cost to repair and recondition the Repossessed Equipment or Returned Equipment and its potential resale price;

(c)    upon U.S. Bancorp Leasing & Financial's prior written approval, at U.S. Bancorp Leasing & Financial's expense for parts, shipping, handling and transportation, but not for Vendor's labor or storage costs, refurbish, renovate, repair and update, the Repossessed Equipment or Returned Equipment;

(d)     assist U.S. Bancorp Leasing & Financial in remarketing, including without limitation selling or re-leasing to lessees satisfactory to U.S. Bancorp Leasing & Financial in its sole discretion, the Repossessed Equipment or Returned Equipment on a non-discriminatory basis on U.S. Bancorp Leasing & Financial's behalf to third parties on terms and at a reasonable selling price or rental acceptable to U.S. Bancorp Leasing & Financial; and

(e)     Promptly deliver to U.S. Bancorp Leasing & Financial all Repossessed Equipment and Returned Equipment in Vendor's possession or legal control if U.S. Bancorp Leasing & Financial requests such a return and preapproves the expenses associated therewith.

Vendor acknowledges that it will have no interest in Repossessed Equipment or Returned Equipment until full payment has been made to U.S. Bancorp Leasing & Financial, except that any such interest of Vendor shall be subordinate to the interest of U.S. Bancorp Leasing & Financial until U.S. Bancorp Leasing & Financial has been paid the entire Disbursement Balance with respect to the related Contract, under this Support Agreement and that it will hold such Equipment on U.S. Bancorp Leasing & Financial's behalf. Notwithstanding anything herein to the contrary, all actions taken by the parties under this Agreement shall be in accordance with the applicable Contract and the UCC as adopted in the relevant state.

SA 1.7   Post Resale/Re-Financing and Re-Selling Services.  If any item of Equipment is remarketed pursuant to Section SA 1.6, Vendor shall offer to the purchaser or user thereof, as necessary, Vendor's services in accordance with Vendor's then-current terms, conditions, policies, and prices, and any unexpired Equipment warranties shall extend to and be enforceable by any such purchaser or Vendor without additional costs if Vendor has performed the deinstallation and repair services outlined in Section SA 1.6.

SA 1.8   Other Remarketing Services.  Upon request of U.S. Bancorp Leasing & Financial following the termination or expiration of any Contract, Vendor shall provide or cause to be provided the above services to U.S. Bancorp Leasing & Financial and other remarketing services reasonably requested by U.S. Bancorp Leasing & Financial at costs no less favorable than those offered to other customers similarly situated so long as Vendor or its Affiliates offers the same to third parties, and Vendor shall not discriminate against U.S. Bancorp Leasing & Financial in favor of third parties in offering such services.

SA 1.9   Defaulted Contract Recourse Liability.  (a) With respect to all Repossessed Equipment, other than Repossessed Equipment relating to a Non-Recourse Contract, Vendor agrees that it shall pay to U.S. Bancorp Leasing & Financial, promptly after receipt of U.S. Bancorp Leasing & Financial's invoice, upon the earlier of (i) the remarketing of the Equipment or (ii) one hundred eighty (180) days after U.S. Bancorp Leasing & Financial's or Vendor's obtaining legal control and possession thereof, an amount equal to U.S. Bancorp Leasing & Financial's Remarketing Loss, if any, with respect to such Repossessed Equipment;

(b)     If the amount of Remarketing Proceeds cannot be calculated for the purposes of determining U.S. Bancorp Leasing & Financial's Remarketing Loss under a Defaulted Contract

for a period of 180 days after a User default or expiration of a True Lease, such as when the User has filed a proceeding in bankruptcy or the Equipment cannot be located, the Remarketing Proceeds shall be deemed to be zero, and U.S. Bancorp Leasing & Financial's Remarketing Loss at the end of the 180-day period shall be calculated (and recalculated as of the date of payment in full) and paid to U.S. Bancorp Leasing & Financial by Vendor using that assumption; provided that the aggregate amount of payments by Vendor under subsections (a) and (b) hereof to compensate U.S. Bancorp Leasing & Financial's Remarketing Loss shall not exceed the applicable Recourse Pool Amount.

(c)    If after the 180-day periods referred to in subsections (a) and (b) hereof the Repossessed Equipment relating to a True Lease is recovered and remarketed within 365 days after a User default or the expiration of a True Lease, then U.S. Bancorp Leasing & Financial shall promptly pay from Remarketing Proceeds to Vendor the amount, if any, by which such Remarketing Proceeds plus the amount of U.S. Bancorp Leasing & Financial's Remarketing Loss recovered from Vendor for that Contract, exceeds the amount necessary to avoid a Remarketing Loss.

SA 1.10 Residual Guaranty. Vendor hereby guaranties that upon any remarketing or other disposition of any Returned Equipment, or upon any exercise of any option to purchase Equipment upon termination of the Contract by a User under the terms of the Contract, whether undertaken by Vendor pursuant to Section SA 1.6 or otherwise, U.S. Bancorp Leasing & Financial will recover Remarketing Proceeds of not less than the percentage of the Disbursement Amount of such Contract specified for such purpose in the applicable Approval, or if none is so specified, no less than 5% of the Disbursement Amount in respect of the Contract under which such Equipment was returned, and shall indemnify U.S. Bancorp Leasing & Financial upon demand to the extent such Remarketing Proceeds are less than such percentage amount.

SA 1.11 Application of Excess Proceeds. (a) In the event Vendor shall, at the request of U.S. Bancorp Leasing & Financial, successfully remarket under Section SA 1.6 any Repossessed Equipment relating to a True Lease and shall realize Remarketing Proceeds in excess of U.S. Bancorp Leasing & Financial's Disbursement Balance, such excess shall be shared equally between U.S. Bancorp Leasing & Financial and Vendor.

(b)    In the event Vendor shall, at the request of U.S. Bancorp Leasing & Financial, successfully assist U.S. Bancorp Leasing & Financial in negotiating a purchase of the Equipment by a User prior to termination of the Contract for an amount in excess of U.S. Bancorp Leasing & Financial's Disbursement Balance, such excess shall be shared equally between U.S. Bancorp Leasing & Financial and Vendor.

(c)    In the event Vendor shall, at the request of U.S. Bancorp Leasing & Financial, (i) successfully remarket under Section SA 1.6 any Returned Equipment, or (ii) assist U.S. Bancorp Leasing & Financial in negotiating a purchase of the Equipment by the User at termination of the Contract,

(i)    the first amount equal to the percentage of the Disbursement Amount specified for such purpose in the Approval or, if none is so provided, equal to 20 percent

(20%) of the Disbursement Amount in respect of such Contract shall be for U.S. Bancorp Leasing & Financial;

(ii)    thereafter, the amount equal to 7.5 percent (7.5%) of the Disbursement Amount shall be for Vendor;

(iii)    next, the amount equal to 7.5 percent (7.5%) of the Disbursement Amount shall be for U.S. Bancorp Leasing & Financial; and

(iv)    all remaining proceeds shall be shared 50/50 between U.S. Bancorp Leasing & Financial and Vendor.

SA 1.12 Recourse for Covenants. Notwithstanding any limitation in liability due to the Recourse Pool Amount, the guaranty in Section SA 1.10 or the inclusion of any Contract within the group of non-Recourse Contracts, U.S. Bancorp Leasing & Financial will have full recourse to Vendor for any damages resulting from a breach of any of Vendor's representations, warranties, indemnities and covenants, including without limitation any relating to administration of the Contracts and the Equipment, and as set forth in Sections 4 and 8.1 of the Agreement and Section 1.3 of this Support Agreement.

SA 1.13 Right of First Refusal. Provided there has not occurred any Termination Event, and subject to the other terms and provisions hereof, U.S. Bancorp Leasing & Financial agrees that Vendor shall have a right of first refusal, exercisable within 30 days after U.S. Bancorp Leasing & Financial's receipt of notice of the return of such Returned Equipment, to purchase Returned Equipment of a cash price equal to fair market value as determined by U.S. Bancorp Leasing & Financial's Equipment Department.


ASTEC FINANCIAL SERVICES, INC.          U.S. BANCORP LEASING & FINANCIAL

By: _Stephen C. Anders_                 By: _____

Title: _Vice President_                 Title: _____

# GUARANTY AGREEMENT

The undersigned ASTEC INDUSTRIES, INC., a Tennessee corporation ("Guarantor"), in order to induce U.S. Bancorp Leasing & Financial an Oregon corporation, to enter into that certain Financing Program Agreement ("Agreement") dated September 29, 1999, with ASTEC FINANCIAL SERVICES, INC., a Tennessee corporation ("Vendor"), and Program Documents (as defined in the Agreement) executed by Vendor ("Vendor Program Documents") and purchasing and taking assignment of Contracts (as defined in the Agreement) thereunder, for other good and valuable consideration, hereby agrees as follows.

## ARTICLE ONE - GUARANTY

1.1    Guaranty. Guarantor hereby unconditionally guarantees to U.S. Bancorp Leasing & Financial the due and punctual payment, performance and discharge (whether upon acceleration or otherwise in accordance with the terms thereof) of all debts, obligations and liabilities of Vendor to U.S. Bancorp Leasing & Financial under the Agreement and any and all Vendor Program Documents (the "Obligations") now existing or hereafter arising, and whether created directly or acquired by assignment or otherwise, together with any and all expenses of, for and incidental to collection, including, without limitation, attorneys' fees (including attorneys' fees in any appeal).

## ARTICLE TWO - WAIVERS AND OTHER AGREEMENTS

2.1    Waivers of Notice. Guarantor hereby waves notice of acceptance hereof; notice of the extension of credit from time to time given by U.S. Bancorp Leasing & Financial to Vendor and the creation, existence or acquisition of any of the Obligations hereby guaranteed; notice of Vendor's default, other than notice of a payment default; notice of the amount of Obligations of Vendor to U.S. Bancorp Leasing & Financial from time to time, subject, however, to Guarantor's right to make inquiry of U.S. Bancorp Leasing & Financial to ascertain the amount of the Obligations at any reasonable time; notice of any adverse change in Vendor's financial condition or of any other fact which might increase Guarantor's risk; presentment for payment, demand, protest and notice thereof as to any instrument; notice of any default; and all other notices and demands to which Guarantor might otherwise be entitled, except as expressly provided in this Agreement.

2.2    WAIVER OF JURY TRIAL ETC. GUARANTOR FURTHER WAIVES THE RIGHT TO A JURY TRIAL IN ANY ACTION HEREUNDER AND RIGHTS BY STATUTE OR OTHERWISE TO REQUIRE U.S. BANCORP LEASING & FINANCIAL TO INSTITUTE SUIT AGAINST VENDOR OR TO EXHAUST ITS RIGHTS AND REMEDIES AGAINST VENDOR, GUARANTOR BEING BOUND TO THE PAYMENT OF EACH AND ALL

OBLIGATIONS OF VENDOR TO U.S. BANCORP LEASING & FINANCIAL WHETHER NOW EXISTING OR HEREAFTER ACCRUING AS FULLY AS IF SUCH OBLIGATIONS WERE DIRECTLY OWING TO U.S. BANCORP LEASING & FINANCIAL BY GUARANTOR.

INITIALS

2.3    Waiver of Defenses Etc.  Guarantor further waives any defense arising by reason of the cessation, from any cause whatsoever, of the liability of Vendor and further agrees that nothing contained herein shall prevent U.S. Bancorp Leasing & Financial from foreclosing on the lien of any security agreement or mortgage, or from exercising any rights available to it thereunder and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor. Guarantor understands that the exercise by U.S. Bancorp Leasing & Financial of certain rights and remedies contained in such security agreement or mortgage may affect or eliminate Guarantor's right to subrogation against Vendor under such security agreement or mortgage and that Guarantor may therefore incur a partially or totally nonreimbursable liability hereunder; nevertheless, Guarantor hereby authorizes and empower U.S. Bancorp Leasing & Financial to exercise, in its sole discretion, any right and remedy, or any combination thereof, which may then be available, since it is the intent and purpose of Guarantor that the Obligations hereunder shall be absolute, independent, and unconditional under any and all circumstances. Guarantor waives all rights and defenses arising out of an election of remedies by U.S. Bancorp Leasing & Financial even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the Obligations, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of applicable law or otherwise. Notwithstanding any foreclosure of the lien of any security agreement with respect to any or all of any real or personal property secured thereby, whether by an action for foreclosure or by an acceptance of any collateral in lieu of foreclosure, Guarantor shall remain bound under this Guaranty.

2.4    Additional Waivers.  Guarantor further waives any defense arising by reason of any defense of Vendor to the Obligations or by reason of the cessation from any cause whatsoever of the liability of Vendor and any defense that other any additional or other indemnity, guaranty, or security was to be obtained.

2.5    Subrogation Postponed.  Notwithstanding any provision of this Guaranty to the contrary, Guarantor hereby irrevocably postpones any claims or other rights which it may now have or hereafter acquire against Vendor or any other guarantor of the Obligations that arise from the existence, payment, performance, or enforcement of Guarantor's obligations under this Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, any right to participate in any claim or remedy of U.S. Bancorp Leasing & Financial against Vendor or any other guarantors of the Obligations or any collateral which U.S. Bancorp Leasing & Financial now has or hereafter acquires, whether or not such right, claims or remedy arises in equity or under contract, statute, or common law, including, without limitation, the right to take or receive from Vendor, directly or indirectly, in cash or

other property or by setoff or in any other manner, payment or security on account of such right, claim, or remedy until all Obligations have been paid or performed in full.

2.6 **Insolvency.** If Vendor or any other Guarantor should at any time become insolvent or make a general assignment, or if a petition in bankruptcy or any insolvency or reorganization proceedings shall be filed or commenced by, against, or in respect of Vendor or Guarantor, any and all of the Obligations of Vendor and all of the obligations of Guarantor hereunder or otherwise to U.S. Bancorp Leasing & Financial shall, forthwith, become due and payable without notice.

2.7 **Right to Settle, Release, Etc.** Guarantor consents and agrees, without notice to or by Guarantor hereunder, that U.S. Bancorp Leasing & Financial may compromise or settle, extend the period of duration or the time for payment or discharge or performance of, or may refuse to enforce or may release all or any and all of the Obligations, or may grant other indulgences to Vendor in respect thereof, or may amend or modify in any manner any documents or agreements relating to the Obligations (other than this Guaranty) or may release, surrender, exchange, modify, impair, or extend the period of duration or time for the performance, discharge, or payment of, any and all deposits and other property securing the Obligations or on which U.S. Bancorp Leasing & Financial at any time may have a lien, or may refuse to enforce its rights, or may make any compromise or settlement or agreement therefor, in respect of any and all of such deposits and property, or with any party to the Obligations, or with any other person, firm or corporation whatsoever, or may release or substitute any one or more of the endorsers or guarantors of the Obligations whether parties to this instrument or not, or may exchange, enforce, waive or release any security for any guaranty of the Obligations.

2.8 **Marshalling of Assets.** Guarantor consents and agrees that U.S. Bancorp Leasing & Financial shall be under no obligation to marshall any assets in favor of Guarantor, Vendor, or any other guarantor or person, firm or corporation liable for the Obligations, or against or in payment of any or all of the Obligations.

2.9 **Payment of Expenses.** Guarantor agrees to pay all expenses incurred by U.S. Bancorp Leasing & Financial in connection with enforcement of its rights under this guaranty, as well as court costs, collection charges and attorneys' fees, including fees incurred in the course of consultation (including any internally allocated costs of in-house counsel), litigation and bankruptcy and administrative proceedings and appeals therefrom.

2.10 **Revival of Obligations.** Guarantor further agrees that to the extent Vendor makes a payment or payments to U.S. Bancorp Leasing & Financial, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to trustee, receiver or any other party under any bankruptcy act or code, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the Obligation or part thereof intended to be satisfied shall be revived and continued in full force and effect as if said payment had not been made.

2.11 **Liability Absolute and Immediate.** Guarantor agrees that the liability of Guarantor on this Guaranty shall be immediate and shall not be contingent upon the exercise or

enforcement by U.S. Bancorp Leasing & Financial of whatever remedies it may have against Vendor or others, or the enforcement of any lien or realization upon any security U.S. Bancorp Leasing & Financial may at any time possess.

## ARTICLE THREE - GENERAL PROVISIONS

3.1    __Guaranty Primary.__  This Guaranty is a primary and original obligation of Guarantor and is an absolute, unconditional, continuing, and irrevocable guaranty of payment and shall remain in full force and effect without respect to future changes in conditions, including any change of law or any invalidity or irregularity with respect to the issuance of any Obligations of Vendor to U.S. Bancorp Leasing & Financial or with respect to the execution and delivery of any agreement between Vendor and U.S. Bancorp Leasing & Financial.

3.2    __Right of Recourse.__  U.S. Bancorp Leasing & Financial shall have a right to seek recourse against Guarantor to the full extent provided for herein and in any other document or instrument evidencing obligations of Guarantor to U.S. Bancorp Leasing & Financial, and against Vendor, to the full extent provided for in any agreement between U.S. Bancorp Leasing & Financial and Vendor. No election to proceed in one form of action or proceeding, or against any party, or on any Obligation, shall constitute a waiver of U.S. Bancorp Leasing & Financial's right to proceed in any other form of action or proceeding or against other parties unless U.S. Bancorp Leasing & Financial has expressly waived such right in writing. Specifically, but without limiting the generality of the foregoing, no action or proceeding by U.S. Bancorp Leasing & Financial against Vendor under any document or instrument evidencing or securing the Obligations of Vendor to U.S. Bancorp Leasing & Financial shall diminish the liability of Guarantor except to the extent U.S. Bancorp Leasing & Financial realizes payment by such action or proceeding, notwithstanding the effect of any such action or proceeding upon Guarantor's right of subrogation against Vendor.

3.3    __Vendor's Financial Condition.__  Guarantor is fully aware of the financial condition of Vendor. Guarantor delivers this Guaranty based solely upon Guarantor's own independent investigation and not upon any representation or statement of U.S. Bancorp Leasing & Financial with respect thereto. Guarantor is in a position to and hereby assumes full responsibility for obtaining any additional information concerning Vendor's financial condition as Guarantor may deem material to its Obligations hereunder. Guarantor is not relying upon, or expecting U.S. Bancorp Leasing & Financial to furnish, any information in U.S. Bancorp Leasing & Financial's possession concerning Vendor's financial condition.

3.4    __Successors and Assigns.__  Guarantor agrees that all rights, benefits and privileges herein and hereby conferred upon U.S. Bancorp Leasing & Financial shall vest in and be enforceable by U.S. Bancorp Leasing & Financial, its successors and assigns. Guarantor and its respective successors and assigns shall be jointly and severally bound by and liable for all terms, covenants and conditions of this guaranty.

3.5    __Choice of Law and Jurisdiction.__  This Guaranty, all acts and transactions hereunder and the rights and obligations of the parties hereto shall be governed, construed and

interpreted according to the laws of the State of Tennessee, without reference to its conflicts of law provisions.

   3.6    <u>Severability</u>.  To the extent any provision of this Guaranty is not enforceable under applicable law, such provision shall be deemed null and void and shall have no effect on the remaining provisions of this Guaranty.

   IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of DATE.

                                    "GUARANTOR"

                                    ASTEC INDUSTRIES, INC.
                                    a Tennessee corporation

                                    By: _____

                                    Type Name:_____

                                    Type Title:_____